37 A.3d 469

VANDELLA DAVIS, AS GUARDIAN AD LITEM FOR ROLAND DAVIS, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. DEVEREUX FOUNDATION, DEVEREUX NEW JERSEY TREATMENT NETWORK, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS, AND CHARLENE MCCLAIN, DEFENDANT.

Argued September 12, 2011—Decided February 29, 2012.

270

Hoens, J., filed a dissenting opinion, in which Long, J., joined.

*Kyle T. Kievit* argued the cause for appellant and cross-respondent.

*Jay A. Gebauer* argued the cause for respondents and cross-appellants (*Post & Schell*, attorneys; *Mr. Gebauer* and *Quinn M. McCusker*, on the briefs).

*Gregory G. Gianforcaro* submitted a brief on behalf of amici curiae Survivors Network for those Abused by Priests and National Child Protection Training Center.

*Robert A. Robinson* submitted a brief on behalf of amicus curiae Disability Rights New Jersey.

*Catherine Weiss* submitted a brief on behalf of amici curiae Community Health Law Project and The Arc of New Jersey (*Lowenstein Sandler*, attorneys; *Ms. Weiss, Kristin A. Muir*, and *Alyson D. Powell*, on the brief).

Justice PATTERSON delivered the opinion of the Court.

This case requires the Court to consider the duty of care owed by a non-profit residential facility to a resident with severe autism and developmental disabilities injured by a criminal act of the facility's employee. On October 9, 2004, Roland Davis (Davis) suffered severe burns after he was scalded with boiling water by Charlene McClain (McClain), a resident counselor employed by defendant Devereux Foundation (Devereux). Devereux is a national charitable foundation that provides services for disabled clients. McClain had no criminal record or prior history of

violence. She attributed her act to Davis's previous aggressive behavior toward her, and to her anger about the recent murder of her boyfriend. She was convicted of, and incarcerated for, her assault upon Davis.

Plaintiff, who is Davis's mother and guardian ad litem, sued Devereux, its local affiliate Devereux New Jersey Treatment Network, and McClain. Barred by the Charitable Immunity Act (CIA), *N.J.S.A.* 2A:53A–7 to –11, from recovering against Devereux on a theory of negligence, plaintiff urges the Court to impose a "non-delegable duty" upon Devereux to protect its residents from the intentional acts of its employees. Plaintiff further contends that McClain was acting within the scope of her employment when she assaulted Davis, and that Devereux should accordingly be held liable pursuant to principles of respondeat superior.

Following discovery, the trial court granted Devereux's motion for summary judgment dismissing all claims. The Appellate Division affirmed in part and reversed in part the trial court's grant of summary judgment. *Davis v. Devereux Found.,* 414 *N.J.Super.* 1, 17, 997 *A.*2d 273 (App.Div.2010). It affirmed the trial court's determination that Devereux did not owe Davis a "non-delegable duty," rejecting plaintiff's contention that such a duty was implicitly recognized by this Court in *Frugis v. Bracigliano,* 177 *N.J.* 250, 827 *A.*2d 1040 (2003), and *Hardwicke v. American Boychoir School,* 368 *N.J.Super.* 71, 845 *A.*2d 619 (App.Div.2003), *aff'd as modified and remanded,* 188 *N.J.* 69, 902 *A.*2d 900 (2006). *Davis, supra,* 414 *N.J.Super.* at 4–10, 997 *A.*2d 273. However, the Appellate Division reversed the trial court's grant of summary judgment, holding that a reasonable jury could conclude that McClain acted in part within the scope of her employment. *Id.* at 12–16, 997 *A.*2d 273.

We affirm in part and reverse in part the Appellate Division's determination. Although we reaffirm the duty of due care imposed upon caregivers with *in loco parentis* responsibilities to persons with developmental disabilities, we concur with the Appellate Division's rejection of the "non-delegable duty" asserted by

plaintiff. Applying the test for the existence of a duty set forth in *Goldberg v. Housing Authority of Newark,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962), and *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 625 *A.*2d 1110 (1993), we conclude that the "non-delegable duty" at issue is not justified by the relationship among the relevant parties, required by the nature of the risk, warranted by the opportunity and ability to exercise care, or grounded in the public policy of our State. The imposition of liability for unexpected criminal acts of properly screened, trained and supervised employees would jeopardize charitable institutions that provide critical services for disabled citizens. We decline to expand New Jersey respondeat superior law beyond its traditional parameters.

We reverse the Appellate Division's decision insofar as it held that the trial court's grant of summary judgment on the issue of whether McClain acted within the scope of her employment was improper. We hold that no rational factfinder could find that McClain's criminal assault on Davis was conducted within the scope of her employment. Accordingly, we hold that the trial court properly granted summary judgment.

I.

Devereux is a non-profit organization whose mission is to provide "services around the nation for persons with emotional, developmental and educational disabilities." Devereux operates a facility in Bridgeton, New Jersey, called the Devereux New Jersey Center for Autism, which accepts residents pursuant to placements by the New Jersey Department of Human Services, Division of Developmental Disabilities.

In 2004, the job of a resident counselor at Devereux was to provide a resident with care, supervision and assistance with his or her daily routine. The work of the resident counselors was overseen by supervisors who prepared the residents' schedules. Each resident was assigned to a counselor on a given day, and was required to comply with the activities set forth on the resident's

daily schedule. Resident counselors were required to document residents' progress toward occupational objectives and other goals.

In accordance with its procedures, Devereux undertook a detailed screening process before hiring McClain as a resident counselor in 2002. It conducted a background check through the Statewide Criminal Felony and Misdemeanor Index and the New Jersey State Police fingerprint system, which revealed no criminal history. It obtained McClain's driver's abstract, which reflected no traffic violations. Devereux staff checked McClain's references; a restaurant that had employed her stated that she had "quit without notification," while a day-care center reported that she was a "very dependable," "pleasant" and "good" worker well-suited to interact with children. A vocational teacher from McClain's high school wrote a recommendation letter stating that McClain was an honor student, active in her church, and that her "dedication, work ethic and moral character" made her ideal for the care of Devereux's residents. McClain provided her high school transcripts and underwent a physical examination, drug test and tuberculosis test, none of which revealed an impediment to her hiring. In short, Devereux conducted a thorough background investigation that revealed no hint of the violent episode to come.

Davis, almost nineteen years old on October 9, 2004, was diagnosed with autism, mental retardation, pervasive developmental disorder and attention deficit hyperactivity disorder. He was placed at Devereux's Bridgeton facility by the Division of Developmental Disabilities in October of 1997, shortly before his twelfth birthday. In 2004, Davis was considered by Devereux counselors to be nonverbal, except for broken word fragments, and he relied upon a Picture Exchange Communications System to communicate with the staff. Davis was able to dress and feed himself, but was unable to administer his daily medications. He required constant supervision by Devereux counselors.

Prior to the October 9, 2004 incident, Davis had a history of aggression toward Devereux staff, which plaintiff characterized as

"screaming, stomping, spitting and the occasional physical alterca-
tion." Two such altercations involving McClain occurred shortly
before the incident that gave rise to this case. According to Alex
Williams, the Devereux program manager, on October 7, 2004,
Davis kicked McClain and "had to be separated from her,"
prompting McClain to "[lose] her cool" and to ask Williams,
"[w]hat are you going to do about him?" According to Williams,
the following day, Davis "attacked [McClain] in the basement of
the house," and had to be escorted upstairs by Williams and
another Devereux staff member. Williams spent the remainder of
that day with Davis, taking him out to dinner and to a football
game.

The following morning, October 9, 2004, McClain was assigned
to serve as Davis's resident counselor for the day. Early that
morning, just after arriving for her shift, McClain put a cup of
water in the facility's microwave and heated it. She then scalded
Davis with the boiling water as he got out of bed. After burning
him with the water, McClain directed Davis to take a shower.
McClain pointed out Davis's burns to another residential counsel-
or, who recalled that she "turned to look at [McClain] because at
this point I was in shock. I said something like how did this
happen. She said what do we do?"

One of McClain's co-workers then called the supervisor, Dale
Smith, who was on his way to work, advising him that Davis had
been burned and that it was an "emergency." Neither McClain
nor her co-workers summoned emergency assistance or took Davis
to the hospital. When Smith arrived, he found Davis sitting in the
residence's living room with severe burns. McClain denied knowl-
edge of the source of Davis's injury. Smith immediately took
Davis to Bridgeton Hospital, which promptly transferred him to a
regional burn center. He was hospitalized for six days, and was
treated for partial thickness burns to his hand, right leg, lower
abdomen, pelvis and groin. He returned to Devereux with perma-
nent scars.

Devereux suspended McClain and a co-worker without pay
pending an internal investigation. The New Jersey State Police

also investigated the incident. A November 2, 2004 interview of McClain conducted by the State Police includes McClain's only account of her motive and actions in the record of this case. After initially denying involvement in Davis's injury, McClain "admitted to causing the injuries to Roland [Davis] in a premeditated manner." The State Police reported her statement as follows:

> Ms. McClain related that she arrived for work at 7:10 A.M., went into the living [room] and sat on the couch for a couple of minutes. She then went in to the kitchen, filled a cup with water and put the cup into the microwave. According to Ms. McClain, she boiled the water for one minute, and went upstairs to get Roland dressed for the day. She took the cup upstairs because she thought that Roland was going to kick her. Roland did not kick or attack her, but Ms. McClain stated she told Roland to get out of bed and poured the water on him anyway. Ms. McClain [then] stated, "I didn't see him burnt, I told him to get into the shower, I was just mad."

Asked by the State Police "why she was mad," McClain "said she was angry because her boyfriend 'Hoove' was the victim of a homicide. 'Hoove' was shot six months ago in Bridgeton City, and [McClain] stated she has been angry since."

Following her confession, McClain was arrested. She pled guilty to third-degree aggravated assault and second-degree bias intimidation and was sentenced to prison. McClain was incarcerated on December 16, 2005, and released on parole on June 16, 2008.

## II.

Plaintiff's complaint, filed on October 4, 2006, asserted claims against Devereux for breach of a "non-delegable duty to protect the plaintiff from harm," intentional infliction of emotional distress, negligent care and supervision of Davis, vicarious liability for the actions of McClain, and "wanton and willful disregard for the rights of the plaintiff" warranting punitive damages. Plaintiff also sued McClain, who did not file an answer or participate in discovery. The parties did not conduct her deposition.[1]

---

[1] On September 3, 2009, the trial court entered a default judgment against McClain, awarding plaintiff $500,000 in non-economic damages, $6,487.37 in medical expenses, and $250,000 in punitive damages.

After discovery, Devereux moved before the trial court for summary judgment. On February 26, 2009, the trial court granted Devereux's summary judgment motion to the extent that the complaint asserted claims for negligence against Devereux, finding that those claims were barred under the CIA, and dismissed plaintiff's claim for punitive damages. However, the trial court denied the summary judgment motion with respect to plaintiff's allegation that Devereux should be held vicariously liable for the actions of its former employee. Relying upon *Restatement (Second) of Agency* § 219 (1958) (hereinafter *Restatement*), *Hardwicke, supra*, 188 *N.J.* at 102, 902 *A.*2d 900, the Developmentally Disabled Rights Act (DDRA), *N.J.S.A.* 30:6D–1 to –12, and *N.J.A.C.* 10:47–5.1(b), the court held that Devereux had a "non-delegable duty to prevent just the type of situation that occurred here." The trial court did not reach the issue of whether McClain acted within the scope of her employment at Devereux.

Devereux moved for reconsideration, arguing that the imposition of a "non-delegable duty" was unsupported by New Jersey law. On May 18, 2009, the trial court granted Devereux's motion for reconsideration, and granted summary judgment dismissing plaintiff's claims. The trial court distinguished case law decided under the Child Sexual Abuse Act (CSAA), *N.J.S.A.* 2A:61B–1, because the CSAA creates a civil remedy for failure to prevent the abuse addressed in that statute, while the DDRA provides no such remedy. The court concluded that New Jersey law does not compel the imposition of a "non-delegable duty" upon Devereux absent a legislative declaration expanding liability or a decision by this Court. The court accordingly granted summary judgment dismissing plaintiff's claims against Devereux.

Plaintiff appealed. The Appellate Division affirmed in part and reversed in part the trial court's decision. *Davis, supra*, 414 *N.J.Super.* at 17, 997 *A.*2d 273. The Appellate Division panel affirmed the trial court's determination that New Jersey law did not impose a "non-delegable duty" upon Devereux. The panel noted that this Court did not impose a "non-delegable duty" upon

the defendant school board for the sexual misconduct of a teacher in *Frugis, supra,* 177 *N.J.* at 278–83, 827 *A.*2d 1040, but instead premised liability upon the board's negligent supervision of the teacher. *Davis, supra,* 414 *N.J.Super.* at 5–6, 997 *A.*2d 273. The panel further rejected plaintiff's argument that in *Hardwicke, supra,* 188 *N.J.* at 100–02, 902 *A.*2d 900, this Court recognized a "non-delegable duty" on the part of the operators of a boarding school for sexual abuse of its students under *Restatement* § 219(c). *Davis, supra,* 414 *N.J.Super.* at 8–10, 997 *A.*2d 273.

The panel concluded that this case should be decided not by the creation of a new duty, but in accordance with established principles of respondeat superior, by which liability may be imposed on an employer if the employee's intentional act is within the scope of employment. *Id.* at 12–16, 997 *A.*2d 273. Relying upon *Gibson v. Kennedy,* 23 *N.J.* 150, 128 *A.*2d 480 (1957), and *Nelson v. American–West African Line, Inc.,* 86 *F.*2d 730 (2d Cir.1936), *cert. denied,* 300 *U.S.* 665, 57 *S.Ct.* 509, 81 *L.Ed.* 873 (1937), the Appellate Division panel reversed the trial court's grant of summary judgment. The panel concluded that a rational factfinder could find that "McClain's motives were at least mixed," and that if avoidance of a violent outburst by Davis "to serve her employer was her intent, at least in part, her employer is liable under *Gibson.*" *Davis, supra,* 414 *N.J.Super.* at 16, 997 *A.*2d 273. The panel remanded the case to the trial court.

The Court granted plaintiff's petition and defendant's cross-petition for certification. *Davis v. Devereux Found.,* 205 *N.J.* 79, 12 *A.*3d 211 (2011); *Davis v. Devereux Found.,* 205 *N.J.* 78, 12 *A.*3d 210 (2011).

## III.

Plaintiff contends that "[i]nstitutions that stand in an *in loco parentis* relationship with those entrusted to [their] care have a heightened duty to protect them from harm, particularly from the intentional acts of [their] own personnel. That duty is of such importance that it must be considered to be non-delegable."

Plaintiff defines the "non-delegable duty" as a "duty to protect those in [Devereux's] care from harm," which particularly applies to the "intentional acts of its own personnel." Plaintiff argues that the "non-delegable duty" obviates the need to prove that the acts at issue were within the scope of McClain's employment. She cites the public policy of New Jersey favoring "protecting the mentally ill and developmentally disabled from abuse or mistreatment, to which they are particularly vulnerable, often being without the knowledge, ability, or resources to protect or vindicate their civil rights," *Fees v. Trow,* 105 *N.J.* 330, 338, 521 *A.*2d 824 (1987), and the Legislature's purpose in enacting the DDRA, *N.J.S.A.* 30:6D–5a(1) and –9.

Plaintiff contends that in *Hardwicke, supra,* 368 *N.J.Super.* at 104–05, 845 *A.*2d 619, and *J.H. v. Mercer County Youth Detention Center,* 396 *N.J.Super.* 1, 18, 930 *A.*2d 1223 (2007), the Appellate Division applied a "non-delegable duty." She argues that in *Hardwicke, supra,* 188 *N.J.* at 102, 902 *A.*2d 900, this Court implicitly imposed a "non-delegable duty" notwithstanding its reliance on two cases that rejected such a duty, *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 *A.*2d 445 (1993), and *Abbamont v. Piscataway Township Board of Education,* 138 *N.J.* 405, 650 *A.*2d 958 (1994). Plaintiff also relies upon the use of the term "non-delegable duty" by New Jersey courts in various contexts. Accordingly, plaintiff urges the Court to reverse the determination of the Appellate Division rejecting the imposition of a "non-delegable duty" upon Devereux.

Addressing the established test of respondeat superior, plaintiff contends that McClain committed her assault on Davis within the scope of her employment. Plaintiff argues that McClain "was certainly within the time and space limitations of her employment at Devereux and she was tending to [Davis] which was what she was employed to do." She contends that because of Davis's history of "aggressive and combative behavior," McClain feared that Davis would kick her, and that McClain's "wrong and prohibited" assault was in part undertaken in furtherance of her job

duties. Plaintiff argues that the Appellate Division properly denied summary judgment on this issue.

Devereux opposes the imposition of a "non-delegable duty" upon institutions charged with the care of residents with developmental disabilities to prevent intentional harm committed by their employees. Devereux contends that the "non-delegable duty" invoked by plaintiff amounts to absolute liability, and that plaintiff conceded that point before the Appellate Division. It distinguishes *Hardwicke, supra,* 368 *N.J.Super.* at 86–94, 845 *A.*2d 619, and *J.H., supra,* 396 *N.J.Super.* at 16–18, 930 *A.*2d 1223, on the grounds that the duties imposed in those cases derive from the CSAA, which imposes statutory "passive abuser" liability upon persons with *in loco parentis* status who are aware of sexual abuse and permit it to occur, and that the abuse at issue in both cases was pervasive and sustained. Devereux acknowledges one "non-delegable duty": a duty to use reasonable measures to protect those in its care from foreseeable harm. It contends that it fully satisfied this duty because it used due care and the actions of McClain were unforeseeable.

Devereux urges reversal of the Appellate Division's determination that summary judgment should be denied with respect to the issue of whether McClain acted within the scope of her employment when she assaulted Davis. It contends that the record establishes the unforeseeability of McClain's violent attack on Davis, given her background and employment history. Devereux argues that "[t]he nature of the act itself was so severe, so shocking and so utterly antithetical, not only to Devereux's interests, but to its entire reason for being," that it falls far beyond the boundaries of her employment responsibilities.

Devereux argues that even if the Court limits the scope of its analysis to McClain's motives, summary judgment is proper given the absence of evidence that McClain's act was intended to serve the interests of her employer. It distinguishes *Gibson, supra,* 23 *N.J.* at 157–59, 128 *A.*2d 480, and *Nelson, supra,* 86 *F.*2d at 731–32, on the ground that both cases concerned supervisory employ-

ees involved in altercations while "trying, however misguidedly, to serve the master." Devereux contends that no rational factfinder could find it liable under the current standard of New Jersey respondeat superior law.

Amicus curiae Disability Rights New Jersey advocates the imposition of a "non-delegable duty" upon Devereux and other residential institutions for people with developmental disabilities. Amici curiae Community Health Law Project and The Arc of New Jersey state that there is a high incidence of abuse of people with developmental disabilities in residential settings, citing publications using national data, and noting the difficulty of obtaining data regarding such abuse in New Jersey. Amici do not argue for a "non-delegable duty," but contend that McClain's abuse of Davis was foreseeable and that Devereux failed to take reasonable measures to prevent it. Amici curiae Survivors Network for those Abused by Priests and the National Child Protection Training Center argue for the imposition of a "non-delegable duty" upon "any governing institution that cares for children." Amici state that when a duty is non-delegable, the defendant's exercise of reasonable care is irrelevant.

## IV.

We review the trial court's grant of summary judgment under the standard of *Rule* 4:46–2, which warrants summary judgment if the court finds, viewing the facts in the light most favorable to the non-moving party, that there are no genuinely disputed issues of fact. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). The Court must consider whether the competent evidential materials presented, viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. *Id.* at 540, 666 *A.*2d 146. Review of an order granting summary judgment is *de novo*; the appellate court need not accept the trial court's findings of law. *Aronberg v.*

*Tolbert,* 207 *N.J.* 587, 597, 25 *A.*3d 1121 (2011); *see also Manala-pan Realty, L.P. v. Manalapan Twp. Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

## V.

■ The doctrine of respondeat superior ("let the superior make answer," *Black's Law Dictionary* 1426 (9th ed.2009)) originated in the seventeenth-century common law of England, based upon the concept "that one who would manage his or her affairs through others is obligated to third persons damaged by such others acting in the course of their employment." 1 J.D. Lee & Barry A. Lindahl, *Modern Tort Law: Liability and Litigation* § 7.2 (West 2000).[2] Respondeat superior has long been part of New Jersey law. *See, e.g., Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 *N.J.* 739, 771, 563 *A.*2d 31 (1989); *Di Cosala v. Kay,* 91 *N.J.* 159, 168–69, 450 *A.*2d 508 (1982); *Gilborges v. Wallace,* 78 *N.J.* 342, 351–52, 396 *A.*2d 338 (1978); *Klitch v. Betts,* 89 *N.J.L.* 348, 351, 98 *A.* 427 (E. & A.1916). The respondeat superior standard thus focuses the Court on the relationship between the employee's job responsibilities and his or her tortious conduct.

Both parties invoke *Restatement* § 219, cited by this Court in *Hardwicke, supra,* 188 *N.J.* at 101–02, 902 *A.*2d 900, and *Lehmann, supra,* 132 *N.J.* at 619–20, 626 *A.*2d 445. It states:

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

 (a) the master intended the conduct or the consequences, or

 (b) the master was negligent or reckless, or

 (c) the conduct violated a non-delegable duty of the master, or

---

[2] The term "vicarious liability," when used to define an employer's liability to third parties for an employee's acts, is synonymous with respondeat superior. 2 Dan B. Dobbs et al., *The Law of Torts* § 425, at 779–80 (2d ed.2011).

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

[*Restatement, supra,* § 219.][3]

The Court considers two issues: whether New Jersey law imposed upon Devereux a "non-delegable duty" to prevent McClain's assault upon Davis within the meaning of *Restatement* § 219(2)(c), and whether a rational factfinder could find that McClain's violent conduct was within the scope of her employment under *Restatement* § 219(1).

*Restatement* § 214, cited by plaintiff, defines the "non-delegable duty" of a principal for the acts of its agent as follows:

A master or other principal who is under a duty to provide protection for or have care used to protect others and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

[*Restatement, supra,* § 214.]

That duty "is not satisfied by using care to delegate its performance to another but is satisfied if, and only if, the person to whom the work of protection is delegated is careful in giving the protection." *Id.* § 214 cmt. a.

The duty asserted by plaintiff diverges from traditional concepts of employer liability in two critical respects. First, in contrast to the "scope of employment" standard, which turns on the parameters of the employment relationship, the duty urged here derives from the relationship between the employer and the person to whom the duty is owed. It is imposed because it is of extraordinary importance to the public. *Davis, supra,* 414 *N.J.Super.* at 10, 997 *A.*2d 273; *Great N. Ins. Co. v. Leontarakis,* 387 *N.J.Super.* 583, 592, 904 *A.*2d 846 (App.Div.2006).

---

[3] *Restatement (Third) of Agency* § 7.05(2) (2006), abandons the use of the term "non-delegable duty." That provision, which neither party has raised in this case, would impose upon the principal a duty of reasonable care with regard to the risk that an agent would harm a person in a "special relationship" with the principal, not a "non-delegable" duty such as that asserted by plaintiff here. *Ibid.*

Second, the duty imposed on the employer cannot be satisfied by the employer's exercise of reasonable care. Only the employee's due care can ensure that the employer's duty is satisfied. When such duty is imposed, "the employer's use of care is irrelevant." *Davis, supra,* 414 *N.J.Super.* at 6, 997 *A.*2d 273 (citing *Majestic Realty Assoc., Inc. v. Toti Contracting Co.,* 30 *N.J.* 425, 439, 153 *A.*2d 321 (1959)); *see also Restatement, supra,* § 214 cmt. a. Measures taken by the employer to guard against intentional harm by employees—careful review of an applicant's educational and employment history, a thorough background check, probing interviews, meticulous training and exemplary supervision—would offer no defense to liability in the presence of the "non-delegable duty." Once an employee has committed a tortious act, the duty would effectively impose absolute liability upon residential institutions. *Restatement, supra,* § 214 cmt. a. The duty would thus represent a significant expansion of New Jersey tort law, at the expense of charitable organizations and other providers of essential services to people with developmental disabilities.

## VI.

As the Appellate Division correctly determined, this Court has consistently applied traditional principles of due care and foreseeability to cases involving *in loco parentis* relationships, rather than adopting a "non-delegable" or absolute duty such as that urged by plaintiff here. *Davis, supra,* 414 *N.J.Super.* at 10–12, 997 *A.*2d 273. In *Frugis,* addressing the liability of a board of education for a school principal's sexual abuse of students, the Court clearly articulated a standard grounded in a duty of reasonable care:

> No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others. Although the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care. A board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate

parents during the day are educating, not endangering, and protecting, not exploiting, vulnerable children.

[*Frugis, supra,* 177 *N.J.* at 268, 827 *A.*2d 1040.]

In *Frugis,* liability was premised upon the Board's deviation from the standard of reasonable care in the supervision of the school principal; the Court noted that the Board "failed to implement effective rudimentary reporting procedures that would have informed it of [the principal's] misconduct," and "grossly disregarded critical information, either in its hands or easily accessible, that called for scrutiny of [the principal's] activities." *Id.* at 270, 827 *A.*2d 1040. *Frugis,* in which the CIA did not apply, confirms that the *in loco parentis* institution is held to a duty of due care, not absolute liability as is claimed here.

In *Hardwicke,* the Appellate Division and this Court considered the liability of a private school for an employee's sexual abuse of students boarding at the school. *Hardwicke, supra,* 188 *N.J.* at 75–79, 902 *A.*2d 900; *Hardwicke, supra,* 368 *N.J.Super.* at 103, 845 *A.*2d 619. The primary focus of the case was the impact of the CSAA, in which the Legislature provided for a private right of action against a "passive abuser" who knowingly permits or acquiesces in the sexual abuse of a child. *See Hardwicke, supra,* 188 *N.J.* at 84–94, 902 *A.*2d 900 (citing *N.J.S.A.* 2A:61B–1(a)(1)). The Appellate Division also discussed common-law causes of action available to the *Hardwicke* plaintiff for the intentional conduct of the school employee notwithstanding the immunity afforded to the school by the CIA. In that context, the Appellate Division in *Hardwicke* characterized *Frugis* as standing for the proposition that "a school that stands in an *in loco parentis* relationship to a boarding student in its charge has ... a non-delegable duty to take reasonable measures to safeguard the student and ensure that its employees do not endanger or exploit the child." *Hardwicke, supra,* 368 *N.J.Super.* at 104–05, 845 *A.*2d 619 (citing *Frugis, supra,* 177 *N.J.* at 268, 827 *A.*2d 1040).

The Appellate Division's decision in *Hardwicke* described the duty imposed by *Frugis* as requiring "reasonable measures" and therefore restates negligence principles. *Ibid.* If the Appellate

Division intended to impose a "non-delegable duty" such as that urged by plaintiff here, that analysis was not reached by this Court. Indeed, as the Appellate Division noted in *Davis, supra,* 414 *N.J.Super.* at 10, 997 *A.*2d 273, this Court's decision in *Hardwicke* underscores the continued viability of reasonable care as the standard imposed upon *in loco parentis* institutions. In that opinion, the Court relied upon its analysis in *Lehmann, supra,* 132 *N.J.* at 619–20, 626 *A.*2d 445, and *Abbamont, supra,* 138 *N.J.* at 418, 650 *A.*2d 958, holding that "[t]he considerations that informed our analyses in *Lehmann* and *Abbamont* apply equally to claims predicated on facts indicating child abuse." *Hardwicke, supra,* 188 *N.J.* at 102, 902 *A.*2d 900. In both *Lehmann* and *Abbamont,* the Court declined to substitute a "non-delegable duty" for traditional tort principles.[4] As the Appellate Division panel noted in Davis, this Court's opinion in *Hardwicke* cannot be read to introduce "what would clearly be a major doctrinal change respecting the law governing institutions that care for children and the disabled." *Davis, supra,* 414 *N.J.Super.* at 10, 997 *A.*2d 273.[5] The liability of *in loco parentis* institutions

---

[4] In *Lehmann,* the Court specifically rejected "strict liability" as the standard for employer liability for sexual harassment in violation of the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42, and confirmed the continued viability of vicarious liability and negligent supervision principles as the governing standard. *Lehmann, supra,* 132 *N.J.* at 623–24, 626 *A.*2d 445. *Abbamont,* in which the Court applied its analysis in *Lehmann* to cases brought under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8, similarly relied on "agency principles, which includes negligence," rather than a non-delegable duty, as the measure of the employer's liability for compensatory damages. *Abbamont, supra,* 138 *N.J.* at 417, 650 *A.*2d 958 (quotation omitted).

[5] Plaintiff cites the Appellate Division's decision in *J.H., supra,* 396 *N.J.Super.* at 16–18, 930 *A.*2d 1223, which concerned the CSAA. However, to the extent that the panel deciding *J.H.* invoked a "non-delegable" common-law duty, purportedly created by this Court in *Hardwicke* and *Frugis,* it misconstrued this Court's decisions in those cases. In *J.H.,* the Appellate Division held that in *Hardwicke,* this Court "determined the application of Section 219(2)(d) of the *Restatement,* imposing liability on an employer for the torts of its employee committed while acting outside the scope of his employment when the conduct violated a non-delegable duty of the employer, applies to CSAA claims against the employer."

has thus been determined in accordance with traditional negligence principles; the "non-delegable" duty proposed here, amounting to an employer's absolute liability for an employee's criminal act, has not been accepted by this Court in any setting similar to that of this case.

## VII.

Thus, traditional concepts of duty govern the liability of institutions with *in loco parentis* responsibilities. Subject to the limits imposed by the Legislature upon the liability of charitable institutions in the CIA, *N.J.S.A.* 2A:53A–7 to –11, Devereux owes to Davis a duty of reasonable care. That duty extends to the selection and supervision of employees such as McClain. Consistent with *Restatement* § 219(2)(b), New Jersey courts recognize the tort of negligent hiring, "where the employee either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons." *Di Cosala, supra,* 91 *N.J.* at 173, 450 *A.*2d 508; *see also Puckrein v. ATI Transport, Inc.,* 186 *N.J.* 563, 579, 897 *A.*2d 1034 (2006); *Lingar v. Live–In Companions, Inc.,* 300 *N.J.Super.* 22, 30, 692 *A.*2d 61 (App.Div.1997). And as discussed above, this Court has also imposed upon employers with *in loco parentis* responsibilities a duty to exercise reasonable care in the supervision of employees. *See e.g., Frugis, supra,* 177 *N.J.* at 270–71, 827 *A.*2d 1040. We recognize and reaffirm that a duty of due care— subject to the statutory immunities afforded by the CIA—is imposed upon institutions, such as Devereux, which are charged to protect vulnerable citizens of our State.

---

J.H., supra, *396* N.J.Super. *at 17–18, 930* A.2d *1223. As noted* supra, *the* Restatement *provision regarding the "non-delegable duty" is § 219(2)(c).* Restatement *§ 219(2)(d), cited by this Court in* Hardwicke *in its discussion of* Lehmann, *provides for liability if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."* Hardwicke, supra, *188* N.J. *at 101 n. 13, 902* A.2d *900. Accordingly,* J.H. *does not support the duty urged here.*

 In that setting we consider the absolute duty, characterized as a "non-delegable duty," that is proposed by plaintiff here. The analysis adopted in *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291, and further developed by this Court in *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110, sets forth factors that are appropriate to our consideration of whether to adopt the duty at issue.[6] The Court held in *Hopkins:*

> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct. [*Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110 (citing *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291).]

Applying the first factor identified in *Hopkins,* the Court analyzes the relationship among the parties—Davis, McClain and Devereux—to determine the necessity and fairness of the duty proposed. Davis and other individuals with developmental disabilities in residential facilities cannot defend themselves. They are often nonverbal and thus incapable of reporting abuse. They are dependent on their caregivers to protect them from harm. They require and deserve vigilant protection and care. Accordingly, the

---

[6] Contending that *Goldberg* and *Hopkins* set forth "an entirely inappropriate framework to use in this dispute, because ... Devereux unquestionably has a duty of care to Davis," the dissent asserts that "the only question that the Court should be addressing is whether or not that duty is non-delegable." *Post* at 319, 37 *A.*3d at 499. The factors identified in *Goldberg* and *Hopkins* are not limited to cases in which a court considers the imposition of a duty upon a party who was previously held to bear no duty at all. Indeed, in *Goldberg,* the Court acknowledged various duties of care already imposed upon landlords such as the defendant housing authority. 38 *N.J.* at 586–88, 186 *A.*2d 291. Its analysis governed the issue before it: whether to impose a new duty, that of providing police protection, on the landlord. Here, plaintiff similarly seeks recognition of a new duty; she would impose liability upon Devereux for McClain's criminal assault, whether or not that assault was within the scope of her employment. The factors developed by this Court in *Goldberg* and *Hopkins* are thus instructive.

Legislature has determined that the relationship between residential facilities and their residents should be intensely regulated, pursuant to the strong state policy of protecting children and adults with developmental disabilities. *Fees, supra,* 105 *N.J.* at 338, 521 *A.*2d 824. The Legislature has enacted the DDRA to protect the safety and legal rights of people with developmental disabilities.[7] It provides in part:

> Every service for persons with developmental disabilities offered by any facility shall be designed to maximize the developmental potential of such persons and shall be provided in a humane manner in accordance with generally accepted standards for the delivery of such service and with full recognition and respect for the dignity, individuality and constitutional, civil and legal rights of each person receiving such service, and in a setting and manner which is least restrictive of each person's personal liberty.
>
> [*N.J.S.A.* 30:6D–9.]

Regulatory provisions require facilities that care for people with developmental disabilities to ensure their residents' civil and legal rights. *See, e.g., N.J.A.C.* 10:44A–3.1; *N.J.A.C.* 10:44B–3.1; *N.J.A.C.* 10:47–5.1. Other provisions govern administration, transportation and the provision of health care. The Department of Human Services has the authority to revoke the licenses of institutions that fail to comply with statutory or regulatory requirements. *N.J.A.C.* 10:44A–1.8; *N.J.A.C.* 10:44B–1.6.

The Legislature has also addressed another component of the relationship among the parties: the qualifications and conduct of employees charged with the care of individuals with developmental disabilities. Facilities are required to conduct background checks,

---

[7] The Legislature and the Governor have consistently stated their concern for the protection of individuals with developmental disabilities. Should it be determined that the imposition of expanded liability upon such caregivers furthers the public policy of protecting developmentally disabled citizens, the Legislature can accomplish that objective by statute. The legislative process would provide the opportunity to consider such factors as the incidence of abuse, the potential impact of broadened liability upon nonprofit caregivers, and the additional cost that would be imposed upon residents, their families and the State. Currently, nothing in the language or legislative history of the two relevant statutes—the CIA and DDRA—suggests the Legislature's intent that a "non-delegable duty" be imposed here.

and are prohibited from hiring individuals who have committed one in a list of enumerated crimes. *N.J.S.A.* 30:6D–64. Caregivers must report incidents of abuse to the Department of Human Services. *N.J.S.A.* 30:6D–75. The statute establishes a "Central Registry of Offenders Against Individuals with Developmental Disabilities"; employers are prohibited from hiring individuals whose names appear on that Registry to care for people with developmental disabilities. *N.J.S.A.* 30:6D–77.

Like the statutory and regulatory framework, existing principles of tort law underscore the importance of institutions' strict oversight over employees charged with the care of residents with disabilities. Subject to the constraints of the CIA, the Tort Claims Act, *N.J.S.A.* 59:1–1 to 59:12–3, and other statutory immunities, causes of action for negligence or recklessness in the hiring and supervision of employees deter employers from engaging in such conduct. *See Lynch v. Scheininger,* 162 *N.J.* 209, 239–40, 744 *A.*2d 113 (2000) (quoting *Procanik v. Cillo,* 97 *N.J.* 339, 354, 478 *A.*2d 755 (1984)); *Hopkins, supra,* 132 *N.J.* at 448, 625 *A.*2d 1110 ("The imposition of liability should discourage negligent conduct by fostering reasonable conduct and creating incentives to minimize risks of harm."); 1 *The Law of Torts, supra,* § 14, at 29. Employees who abuse persons with developmental disabilities can be held civilly liable. And as this case illustrates, the criminal justice system has a role in deterring and punishing conduct such as McClain's.

Thus, the relationship among the parties—the resident, the institution and the employee—is addressed in statutes, regulations and the common law. Those sources of law assign to institutions serving people with developmental disabilities the responsibility to take precautions with respect to many factors within their control, including the hiring, training and supervision of employees. The record of this case does not establish a pervasive pattern of abuse that would signal that existing law had

failed to protect these vulnerable members of our society.[8] Although amici note that abuse of individuals with developmental disabilities is widespread nationally, the record contains no testimonial or documentary evidence addressing that issue in New Jersey. The Court has no evidence regarding the incidence of violence against New Jersey citizens with developmental disabilities, the various forms of abuse, the impact of alternative residential settings, or precautions that caregivers can take to prevent criminal acts. Such a record might support a finding under the first consideration identified in *Hopkins* that the existing duty should be expanded, but it has not been presented here. *See Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110; *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291. Absent an appropriate record, the Court declines to impose a broad and unprecedented duty on institutions caring for people with developmental disabilities.

The second consideration identified in *Hopkins* is "the nature of the attendant risk." *See Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110; *Goldberg, supra,* 38 *N.J.* at 589, 186 *A.*2d 291. This aspect of the inquiry focuses the Court on the issue of whether the risk is foreseeable, whether it can be readily defined, and whether it is fair to place the burden of preventing the harm upon the defendant. As the Court has stated,

---

[8] Relying upon media reports that were not in the record of the trial court, the dissent cites examples of abuse of disabled individuals in custodial care. *Post* at 321–23, 37 *A.*3d at 501–02. As this Court has long held, appellate review is limited to the record developed before the trial court. *See, e.g., Rule* 2:5–4; *New Jersey DYFS v. M.M.,* 189 *N.J.* 261, 278, 914 *A.*2d 1265 (2007) (stating "[o]ur scope of review . . . is limited to whether the trial court's decision is supported by the record as it existed at the time of trial"); *State v. Golotta,* 178 *N.J.* 205, 211–12, 837 *A.*2d 359 (2003) (stating "[i]t would be inconsistent with appellate practice for us to accept the proffered information here, especially in view of the fact that the State had ample opportunity two years ago to present it at the proper forum, namely, at the original suppression hearing"). Had a record regarding the incidence of abuse of individuals with autism in New Jersey residential facilities been developed before the trial court, it would be available to be addressed by the parties and amici and considered by the Court. No such record was developed in this case.

identifying a given risk does not itself address the actual burden that would be placed on a party in preventing such a risk and whether that burden should be imposed.

[*Hopkins, supra,* 132 *N.J.* at 443, 625 *A.*2d 1110 (citing *Weinberg v. Dinger,* 106 *N.J.* 469, 524 *A.*2d 366 (1987)).]

In *Goldberg,* rejecting the imposition of a duty on the part of the owner of a housing project to provide police protection, the Court noted, "[t]he second consideration is the inevitable vagueness of the proposed duty. Fairness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it." *Goldberg, supra,* 38 *N.J.* at 589, 186 *A.*2d 291.

As in *Goldberg,* the nature of the risk addressed here makes it impossible to clearly define the parameters of the duty. It is unclear on this record whether McClain's crime is aberrational or typical of a statewide trend. Even the proponents of the duty in this case disagree about its proposed scope. Plaintiff urges the Court to impose a "non-delegable duty" on institutions that provide residential care for people with developmental disabilities. Amici Survivors Network for those Abused by Priests and the National Child Protection Training Center go further and seek to broaden such a duty to any institution charged with the care of children, whether or not they have developmental disabilities. The duty proposed could be extended to hospitals, nursing homes, assisted living facilities, day care centers and schools, and its parameters are uncertain. *See Goldberg, supra,* 38 *N.J.* at 590–91, 186 *A.*2d 291. The second prong of the *Hopkins* test does not support the imposition of such an expanded duty here on the present record.

 The third factor—the opportunity and ability to exercise care—provides no support for plaintiff's claim. Existing law already places a duty of reasonable care on Devereux; plaintiff seeks to elevate that duty to one of absolute liability. In contrast to the setting of *Hopkins,* in which the Court articulated workable guidelines by which realtors could minimize the risk of harm, the "practicability of preventing the harm" is undefined here. *See*

*Hopkins, supra,* 132 *N.J.* at 443, 625 *A.*2d 1110. There is no evidence that Devereux ignored hints that McClain had a potential for violence, that it condoned or tolerated aggressive behavior by its employees, or that it failed to teach its staff how to deliver respectful and compassionate care.[9] The record reveals no deviation from sound hiring, screening and training practices. It defines no procedures by which an employer in Devereux's situation could anticipate and forestall the harm visited by McClain upon Davis. The third consideration identified in *Hopkins* thus weighs against the duty proposed.

The fourth factor noted in *Hopkins,* the public interest in the proposed solution, does not support the creation of a "non-delegable duty." There is no record in this case demonstrating the existence of a pervasive problem that would call for the elevation of the duty proposed here. The provision of high-quality institutional care to residents who are developmentally disabled is an important public policy of our State. Non-profit charitable organizations perform an invaluable service to their clients with developmental disabilities and the public as a whole. The imposition of liability upon these organizations for unforeseeable intentional acts of employees such as McClain could jeopardize their continued existence, deter the founding of new providers that could deliver quality services, and increase the cost incurred by residents, families and the State in maintaining residents in institutional care. This record provides no basis to impose such a burden on these institutions. Further, the "public interest" con-

---

[9] The dissent asserts an "abject failure" by Devereux "to recognize the impending clash between [McClain] and Davis when her demand for relief was ignored." *Post* at 321, 37 *A.*3d at 500. The claim to which McClain's continued work assignment to care for Davis would be relevant—plaintiff's negligent supervision claim—is no longer in this case. Plaintiff's counsel conceded at oral argument before the trial court that her negligence claims against Devereux are barred by the CIA. The trial court's dismissal of those claims was not appealed, and the issue of the impact of the CIA upon plaintiff's negligent supervision claim, and her other negligence claims, is accordingly not before the Court.

sideration identified in *Hopkins* is also negatively implicated by the amorphous boundaries of the duty proposed. The *Hopkins* test thus does not warrant the "non-delegable duty" proposed here.

Plaintiff relies upon *Majestic Realty, supra,* 30 *N.J.* at 425, 153 *A.*2d 321, and *Great Northern, supra,* 387 *N.J.Super.* at 591, 904 *A.*2d 846, for the proposition that a "non-delegable duty" is warranted when the social value to the community is so significant that the law bars the transfer of a duty to another. Both decisions address the liability of a principal who employs an independent contractor to undertake an inherently hazardous activity. In *Majestic Realty, supra,* 30 *N.J.* at 428, 153 *A.*2d 321, the activity was building demolition, and in *Great Northern, supra,* 387 *N.J.Super.* at 588, 904 *A.*2d 846, it was excavation involving the removal of lateral supports from adjacent land. While these cases discuss the societal interest in the activity as a foundation for a "non-delegable duty," that discussion derives from the threat to public safety, unavoidable when a contractor performs these dangerous tasks, for which the principal is directly liable. *Majestic Realty, supra,* 30 *N.J.* at 438–39, 153 *A.*2d 321; *Great Northern, supra,* 387 *N.J.Super.* at 591–92, 904 *A.*2d 846. *Majestic Realty* and *Great Northern* are inapposite.

The heightened duty of care that has long been imposed upon the operators of common carriers is similarly irrelevant. *See Lieberman v. Port Auth. of N.Y. & N.J.,* 132 *N.J.* 76, 85, 622 *A.*2d 1295 (1993) ("New Jersey has a long history of imposing liability on common carriers for failure to provide adequate security."); *Ricci v. Am. Airlines,* 226 *N.J.Super.* 377, 381–82, 544 *A.*2d 428 (App.Div.1988); *Sandler & Hudson v. Manhattan R.R.,* 8 *N.J.Misc.* 537, 538, 151 *A.* 99 (Sup.Ct.1930), *aff'd,* 108 *N.J.L.* 203, 156 *A.* 459 (E. & A.1931). Commentators have characterized the duty as one of "the highest degree of vigilance, care and precaution." W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 34, at 209 (5th ed.1984). However, the heightened duty of a common carrier is subject to a standard of reasonableness, and

does not apply if the common carrier "neither knows nor should know of the unreasonable risk, or of the illness or injury." *Restatement (Second) of Torts* § 314A cmt. e (1965). That duty does not support the imposition of liability upon Devereux for its employee's intentional act.

Plaintiff also relies upon *Stropes v. Heritage House Childrens Center of Shelbyville, Inc.*, 547 *N.E.*2d 244 (Ind.1989). The plaintiff in *Stropes*, an individual with severe developmental disabilities who was unable to care for himself, was placed in the defendant's care by a county agency, where he was sexually assaulted by a nurse's aide. *Id.* at 245. Relying on common-carrier cases, the Indiana Supreme Court imposed a "non-delegable duty" of care upon the defendant "[g]iven the degree of [plaintiff's] lack of autonomy and his dependence on [defendant] for care and the degree of [defendant's] control" over plaintiff. *Id.* at 254; *see also Miller v. Martin*, 838 *So.*2d 761, 768–69 (La.2003) (imposing "non-delegable duty" on Louisiana Department of Social Services for intentional abuse of children by foster parents selected by Department).

Other state courts have rejected the imposition of the duty imposed in *Stropes*, determining that established tort law appropriately balanced the parties' interests, or deferring the issue to their legislatures. In *Niece v. Elmview Group Home*, 131 *Wash.*2d 39, 929 *P.*2d 420 (1997), the Supreme Court of Washington declined to apply a "non-delegable duty" in circumstances similar to those of *Stropes*. Noting that "Indiana is apparently the only jurisdiction to adopt the nondelegable duty theory recognized in *Stropes*," *id.* at 430, the court instead applied a direct duty of care upon the defendant, based upon negligence principles, to guard against harm to patients "unless it is so highly extraordinary or improbable as to be wholly beyond the range of expectability," *id.* at 427 (citation omitted). The court confirmed the deterrent effect of the law of negligence, noting

the broad negligence liability that we have already recognized creates adequate incentives for the operators of group homes for developmentally disabled persons to take all reasonable precautions against sexual abuse in their facilities. The

nondelegable duty theory would only impose additional liability without corresponding fault, making group homes insurers of their employees' conduct.
[*Id.* at 430.]

In *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 *Ark.* 555, 49 *S.W.*3d 107 (2001), a case involving a sexual assault on a semicomatose, quadriplegic patient by a nursing assistant, the Supreme Court of Arkansas imposed "a duty of ordinary care to furnish [the patient] the care and attention reasonably required by her condition," rather than a "nondelegable duty." *Id.* at 112; *see also Worcester Ins. Co. v. Fells Acres Day Sch. Inc.*, 408 *Mass.* 393, 558 *N.E.*2d 958, 968 (1990) (declining to impose common-law "non-delegable duty" on day care center); *Maguire v. State*, 254 *Mont.* 178, 835 *P.*2d 755, 759 (1992) (declining to impose "non-delegable duty" on institution for sexual assault committed by employee on woman with developmental disabilities, leaving issue for legislative attention). Our current state of the law is thus consistent with the decisions of almost every jurisdiction that has addressed this question.

The dissent asserts that *Stropes* heralded a trend toward the non-delegable duty pressed by plaintiff in this case. *Post* at 317–19, 37 *A.*3d at 498–99. Other than *Stropes, supra*, and *Miller, supra*, none of the decisions from other jurisdictions that are cited by the dissent imposed a duty analogous to the duty at issue here. Although the court deciding *Hinckley v. Palm Beach County Board of Commissioners*, 801 *So.*2d 193, 195–96 (Fla.Dist.Ct.App. 2001), characterized the duty imposed by virtue of an independent contractor's intentional act as "non-delegable," it limited that duty to foreseeable harm, and thus defined it in terms of traditional negligence. In *West v. Waymire*, 114 *F.*3d 646, 649 (7th Cir.1997), the United States Court of Appeals for the Seventh Circuit did not find a "non-delegable duty" such as that suggested here. Dismissing a civil rights claim brought pursuant to 42 *U.S.C.* § 1983 for a municipal police officer's sexual abuse of a minor whom he drove home while he was on duty, the court stated in dicta that the plaintiff should be able to prevail in a parallel state action because the officer's acts "should be sufficiently within the orbit of his

employer-conferred powers to bring the doctrine of respondeat superior into play." We respectfully disagree with the dissent's suggestion that the law of other states reflects a recent trend in favor of its view.

We decline to impose a "non-delegable duty" upon Devereux in this case.[10] We therefore affirm that portion of the Appellate Division's decision that upheld the trial court's grant of the defendant's motion for reconsideration and for summary judgment.

## VIII.

The Appellate Division further held that the trial court should have denied Devereux's motion for summary judgment because "plaintiffs are entitled to pursue their common law claims under the rule laid down in *Gibson.*" *Davis, supra,* 414 *N.J.Super.* at 16, 997 *A.*2d 273. We do not agree.

The "scope of employment" test requires a fact-specific inquiry:

> The scope of employment standard, concededly imprecise, is a formula designed to delineate generally which unauthorized acts of the servant can be charged to the master. Furthermore, the standard "refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."
>
> [*Di Cosala, supra,* 91 *N.J.* at 169, 450 *A.*2d 508 (quoting W. Prosser, *Law of Torts* 460–61 (4th ed.1971)).]

The foreseeability of the employee's act is a crucial inquiry. *See Mason v. Sportsman's Pub,* 305 *N.J.Super.* 482, 499, 702 *A.*2d 1301 (App.Div.1997); *Schisano v. Brickseal Refractory Co.,* 62 *N.J.Super.* 269, 275–76, 162 *A.*2d 904 (App.Div.1960).

---

10 It is undisputed that Devereux is a charitable institution entitled to the protection of the CIA, *N.J.S.A.* 2A:53A–7 to –11. We do not reach the issue of whether the "non-delegable duty" at issue, were such a duty to be recognized, would be barred by the CIA. *See N.J.S.A.* 2A:53A–7; *P.V. ex rel. T.V. v. Camp Jaycee,* 197 *N.J.* 132, 962 *A.*2d 453 (2008).

 *Restatement* § 228(1) describes four factors that collectively support a finding that an employee's act is within the scope of his or her employment:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master; and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

[*Restatement, supra,* § 228(1).]

Conversely, an employee's act is outside of the scope of his or her employment "if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* § 228(2). Only rarely will intentional torts fall within the scope of employment. *Schultz v. Roman Catholic Archdiocese of Newark,* 95 *N.J.* 530, 535 n.1, 472 *A.*2d 531 (1984); *Di Cosala, supra,* 91 *N.J.* at 173, 450 *A.*2d 508.

 The difference between acts that are within the scope of employment and acts that are not is sharply illustrated when a employee, working for a lawful employer, commits a crime. Under *Restatement* § 231, "[a]n act may be within the scope of employment although consciously criminal or tortious." However,

[t]he fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result.

[*Restatement, supra,* § 231 cmt. a.]

When the employee's crime is serious, it is "in nature different from what servants in a lawful occupation are expected to do." *Ibid.*

This distinction is illustrated by the decisions in *Gibson, supra,* and *Nelson, supra,* cited by the Appellate Division, and in related New Jersey authority. When the employee's conduct—however aggressive and misguided—originated in his or her effort to fulfill an assigned task, the act has been held to be within the scope of employment. In *Gibson, supra,* the defendant Kennedy was a railroad conductor charged with the responsibility of ensuring that

the train departed the New Brunswick station without passengers. 23 *N.J.* at 150, 154–55, 128 *A.*2d 480. Gibson, another railroad employee, was authorized by the railroad to remain on the train beyond New Brunswick, but chose not to reveal that authorization to Kennedy. *Id.* at 155, 128 *A.*2d 480. He refused to comply with Kennedy's direction to leave the train. *Ibid.* An altercation ensued in which Kennedy repeatedly struck Gibson with a lantern, leaving him unconscious. *Id.* at 156, 128 *A.*2d 480. The Court held that a reasonable jury could find that Kennedy, "who was in charge of the train, acted in the scope of his employment" when he "sought to prevent a person he believed to be unauthorized from boarding the train." *Id.* at 156–57, 128 *A.*2d 480. It noted that if the employee acts within the scope of his employment and intends to further the employer's business, "the employer is chargeable even though the employee's conduct be 'imbecilic.' " *Id.* at 158, 128 *A.*2d 480 (citation omitted).

The same principle guided the decision in *Nelson, supra,* 86 *F.*2d at 730, upon which this Court relied in *Gibson.* In *Nelson,* an inebriated boatswain, wrongly believing that a sailor whom he found sleeping was supposed to be on watch duty, punched him and ordered him to return to duty. Judge Learned Hand noted that "motives may be mixed," *id.* at 731, but held that if the boatswain "really meant to rouse the plaintiff and send him upon duty," his employer was liable for his conduct, *id.* at 732. As in *Gibson,* the focus was on the employee's attempt, however unwise, to carry out his employer's instructions.

Other courts have found employees' acts to be within the scope of their employment when their attempts to enforce their employer's rules instigated violence. In *Mason, supra,* 305 *N.J.Super.* at 488–91, 702 *A.*2d 1301, a bouncer was held to be acting within the scope of his employment when his attempt to eject a patron from the bar prompted a fistfight. The Appellate Division held that "the force used cannot be considered so unusual or exceptional so as to be 'unexpectable' from one acting as a bouncer in such a setting." *Id.* at 499, 702 *A.*2d 1301. In *Schisano, supra,* 62

*N.J.Super.* at 271–73, 162 *A*.2d 904, an employee was charged with the duty of keeping his employer's private parking lot clear of unauthorized cars. The employee argued with a man who had parked his car in the lot without permission, and eventually punched him, allegedly causing a fatal heart attack. *Ibid.* The Appellate Division held that the employee's impulsive strike may have been in self-defense, but "may also have been [the employee's] way of giving emphasis to the instructions" to remove the vehicle. *Id.* at 275, 162 *A*.2d 904; *see also Smith v. Bosco,* 126 *N.J.L.* 452, 453–54, 19 *A*.2d 637 (E. & A.1941) (holding that bridge employee's attack on plaintiff, who refused to move his truck when instructed to and threw brick at employee's guard dogs, could be considered within scope of his employment); *Gates v. St. James Operating Co., Inc.,* 122 *N.J.L.* 610, 611–12, 7 *A*.2d 632 (Sup.Ct. 1939) (assistant manager who slapped patron who disregarded his instruction to "take your feet down" could be held to be acting within scope of his employment).

The facts of these cases fit a common pattern. In each, the employee's responsibilities include enforcement of the employer's rules. The employee's attempt to compel compliance with those rules was met with resistance and provoked a physical altercation. The courts attribute the conduct, in whole or in part, to the starting point of each incident: the employee's attempt to serve the employer. Accordingly, the employer was potentially liable under principles of respondeat superior.

*Cosgrove v. Lawrence,* 214 *N.J.Super.* 670, 520 *A*.2d 844 (Law Div.1986), *aff'd,* 215 *N.J.Super.* 561, 522 *A*.2d 483 (App.Div.1987), provides an important contrast to the *Gibson* line of cases. In *Cosgrove,* a social worker-therapist employed by a county initiated a sexual relationship with his patient. *Id.* at 673, 520 *A*.2d 844. Because the sexual relationship allegedly commenced in the context of "transference," a form of psychotherapy, the plaintiff and the defendant therapist contended that he was acting within the scope of his employment when he initiated the relationship. *Ibid.* Relying upon *Restatement* § 228, the court rejected the defendant

therapist's argument that the relationship "was a bona fide part of the therapy," holding that his conduct "was not of the kind he was employed to perform but was different in kind from that authorized; it went far beyond authorized space limits; and was too little actuated by a purpose to serve the master." *Id.* at 679, 520 *A.*2d 844. Accordingly, the plaintiff's claims against the employer were dismissed.

██ Like *Cosgrove,* this case is inherently different from the *Gibson* line of cases. The incident at issue here did not begin with a thwarted effort by McClain to enforce her employer's rules. By McClain's own admission, she began her shift by briefly sitting alone and thinking, then surreptitiously boiling the water to be used in her attack. Notwithstanding the fact that she was the subject of a police investigation, McClain made no attempt to suggest that she scalded Davis with boiling water to defend herself from his violent conduct. She told the State Police that while she brought the water upstairs because "she thought that Roland was going to kick her," he "did not kick or attack her," but she poured the water on him anyway, because she was "just mad" about the murder of her boyfriend. Significantly, McClain denied her abuse in her conversations with Devereux supervisors, confessing to her assault of Davis only under police interrogation. There is no indication in the record that Devereux deviated from its mission of providing quality care to Davis. There is no suggestion that in its hiring, training and supervision of McClain, Devereux ever tolerated, let alone encouraged, physical abuse or coercion of Davis, or that McClain was ever instructed to do anything but treat her assigned resident with compassionate care.

The dissent's suggestion, *post* at 327–28, 37 *A.*3d at 504, that McClain's act was provoked by Davis, rather than premeditated as the State Police reported, is contrary to the record. The dissent relies upon the statement of McClain's co-worker, Mattie Benjamin, characterizing that statement as evidence that McClain acted in response to aggression by Davis. *Post* at 327–29, 37 *A.*3d at 504–05. Benjamin, who did not witness the attack but overheard

it, said nothing about an altercation between McClain and Davis on the day of McClain's attack. She gave a written statement which included the following account:

> After Robin [another Devereux employee] left CM took off her coat went into the kitchen then heard the microwave, she then went upstairs, told D "I told you, you wasn't sleeping," and then RD started screaming and stomping, she told him to get in the shower and then she came back downstairs RD was still screaming his scream was different than he normally screams, he is saying something couldn't make out what he was saying until when he come downstairs and SB [another Devereux employee] is looking at his burns he was saying "hot" S [McClain's supervisor] arrived and took him to the hospital.

Benjamin thus confirmed McClain's account that McClain's act was not preceded or instigated by an altercation with Davis, but was an unprovoked attack that was planned by McClain before she entered Davis's room that morning, and followed by Davis's screams in reaction to his pain. The record establishes that McClain's action was not a misguided effort to perform her job responsibilities, but a premeditated act of aggression.

Under *Restatement* § 228(1), McClain's conduct is clearly outside of the scope of her employment. McClain's decision to injure Davis was not only inconsistent with Devereux's purpose in employing her, but directly contravened Devereux's mission to protect a resident for whom Devereux had cared since his childhood. While McClain's act was "substantially within the authorized time and place limits" of her job, it was not by any measure "actuated" by a purpose to serve Devereux. *See Restatement, supra,* § 228(1). McClain's act of violence, concealed from supervisors before and during the assault and denied thereafter, could not have been foreseen by Devereux.

In short, the Court finds that no rational factfinder could construe McClain's premeditated and unprovoked scalding of Davis to be an effort to serve Devereux. As a matter of law, McClain's assault was not within the scope of her employment. The trial court properly granted summary judgment dismissing plaintiff's claims against Devereux.

## IX.

In summary, we affirm the Appellate Division's decision insofar as it rejected the imposition of a "non-delegable duty" upon Devereux. We reverse the Appellate Division's decision to the extent that it held that the trial court's grant of summary judgment was error.

Justice HOENS, dissenting.

It is only through a truncated and carefully parsed recounting of what happened to Roland Davis and a misguided perception about the governing principles of law that the majority can find no warrant for concluding that Devereux, the institution charged with his care, had a non-delegable duty to protect him from harm and that his guardian ad litem is foreclosed from proceeding, alternatively, under a respondeat superior theory. Because the majority has erred in the analysis that it has utilized and because both of those conclusions are the byproduct of that error, I respectfully dissent.

The majority's conclusion that Devereux owed Davis no non-delegable duty of care is faulty for three reasons. First, the majority's result is fueled by the misapprehension that a non-delegable duty would impose absolute liability on Devereux, a consideration that gives rise to a concern for the continued existence and viability of the charitable organizations that most often are the providers of care to severely disabled individuals. Second, the majority's reasoning, which proceeds largely through the application of well-settled principles governing imposition of a duty, reveals an essential confusion between how the Court determines that there is any duty owed and the separate question about whether a duty is non-delegable. Third, the majority rests its decision on the presumption that there is no need for this Court to act in the absence of a fulsome record demonstrating that acts like the one that led to the horrific burns Davis suffered are "pervasive." *Ante* at 298, 37 *A.*3d at 487. Each of those flaws individual-

ly would be troubling enough, but taken together, they cannot go unquestioned.

The majority's conclusion that there is insufficient evidence in this record to permit Davis to withstand summary judgment on a respondeat superior theory is equally flawed. That conclusion arises from the Court's mistaken belief that there is no evidence in this record that would support a jury's conclusion that McClain acted, even in part, with the purpose to serve her employer, defendant Devereux. It is indeed a mistaken belief because it rests on a particular version of the facts drawn from limited sources. Relying on those few facts, the majority ignores significant evidence in the record that a reasonable jury might find sufficient to demonstrate that McClain's act, inexplicable to the majority, was grounded in a terribly misguided effort to carry out her duties and thus to serve the purposes of her employer.

In my view, on both of the issues that confront the Court in this appeal, the majority has pursued a flawed approach to the essential legal principles and has inappropriately identified and weighed the relevant facts. In doing so, the majority has reached erroneous conclusions, as a result of which I respectfully dissent.

I.

Much of the basis for the difference between my views and those expressed by the majority arises from the relative infrequency with which this Court has considered the concept of a non-delegable duty. Because it is a concept not often discussed, it is one that has become misunderstood, and therefore improperly analyzed by the majority, leading to an erroneous result. There are, it seems to me, three basic errors that the majority has made and that cause me to dissent from its conclusion that the duty Devereux owed to Davis was not a non-delegable one.

First, the conclusion that a duty is non-delegable does not equate with absolute, or strict, liability, as the majority apparently believes. On the contrary, as this Court has concluded, it is the

duty that is absolute; whether there is also liability is an entirely separate question.

Second, the question in this case is not whether there is a duty owed at all; plainly Devereux owes a duty of care to Davis. The question is only whether that duty of care qualifies as one that is non-delegable and therefore not discharged by taking care in hiring, training or supervising the employee tasked with performing it. As a result, the majority's discussion of the ordinary four-part test for determining whether there is a duty in the first place is not only unnecessary but comes close to suggesting that Devereux owed Davis, and all of the other residents in its facilities, no duty of care at all.

Third, in performing the usual four-part analysis, the majority presumes that there can be no duty owed in the absence of a record that would amount to "pervasive" abuses of individuals like Davis. Not only is that supposition yet another departure from the ordinary manner of approaching such decisions, but it overlooks the evidence suggesting that particularly vulnerable individuals like Davis in fact are increasingly subjected to such abuses.

For me, it is these three fundamental flaws in the majority's analysis that have led it to an erroneous conclusion and that calls for this dissent.

A.

Although the imposition of a non-delegable duty has been a relatively infrequent occurrence, this Court has previously addressed it. *See Majestic Realty Assocs., Inc. v. Toti Contracting Co.*, 30 *N.J.* 425, 436, 153 *A.2d* 321 (1959). In determining whether the owner of a building, who hired an expert to demolish it, owed the adjoining building's owner a non-delegable duty of care, the Court's approach to the question is instructive. In considering that question, the existence of a duty of care to the adjoining building owner was obvious, and the only question was whether hiring an independent contractor, which under ordinary circumstances would afford the owner a complete shield against

liability, discharged that duty of care. *Id.* at 433–36, 153 *A.*2d 321. In concluding that it did not, this Court reasoned that there are some duties that simply cannot be delegated away, and concluded that the performance of building demolition created such a risk of injury to the neighbor that it qualified as one of them. *Id.* at 438, 153 *A.*2d 321; *see also Great Northern Ins. Co. v. Leontarakis,* 387 *N.J.Super.* 583, 592–93, 904 *A.*2d 846 (App.Div.2006) (concluding that duty of lateral support owed to adjoining landowner is non-delegable); *Marek v. Prof'l Health Servs., Inc.,* 179 *N.J.Super.* 433, 441–42, 432 *A.*2d 538 (App.Div.1981) (concluding that health care provider had non-delegable duty "to carefully and diligently diagnose within reasonable professional standards any condition or disease positively appearing on [the plaintiff's] chest x-ray" notwithstanding referral to independent contractor radiologist).

This Court, in undertaking its analysis, made it plain that the existence of a non-delegable duty does not equate with the imposition of strict liability on the master, *Majestic Realty, supra,* 30 *N.J.* at 436, 153 *A.*2d 321, nor does it implicate the level of care used by the master in choosing the servant in the first place. Instead, when the servant performs a non-delegable duty, the determination of the master's liability turns on whether the servant used due care in the performance of that duty, not upon whether the master used due care in selecting or training the servant. As a result, if the duty is non-delegable, the employer will be liable to the third party if the employee failed to act with due care regardless of whether the act of the employee was within or outside of the scope of employment. *See id.* at 436, 438–39, 153 *A.*2d 321.

Although the liability of the employer could be said to be direct, rather than vicarious, it does not equate with strict, or in the language of the majority, *see ante* at 289, 37 *A.*3d at 481, absolute liability. Instead, rather than judging the employer's liability based on its negligence in hiring, training or supervising the employee, the employer's liability is judged by the care exercised

by the employee. As this Court has explained, "[t]he duty is absolute, not the liability." *Majestic Realty, supra,* 30 *N.J.* at 438, 153 *A.*2d 321 (emphasis added). Although the Court there addressed whether a non-delegable duty could be discharged by hiring an independent contractor, the analysis of the manner in which a non-delegable duty operates as between the employer and an employee is no different. The duty remains that of the employer, with the result that the shield of respondeat superior disappears. The employer becomes responsible for the employee's act, and the employer's liability is tested by the care with which the employee acted rather than by the care with which the employer acted in hiring, training or supervising the employee. *Id.* at 436, 153 *A.*2d 321.

Nor is the majority's effort to distinguish *Majestic Realty* as being limited to circumstances involving independent contractors and inherently dangerous activities, *see ante* at 299, 37 *A.*3d at 487, persuasive, because that approach overlooks the analytical framework ordinarily utilized to establish the existence of a non-delegable duty entirely. Carefully read, the *Majestic Realty* decision squarely represents the appropriate framework that has long governed the non-delegable duty analysis.

Non-delegable duties, although neither particularly familiar nor commonly found, are a well established part of the law of agency. *See Restatement (Second) of Agency* §§ 214, 219(2)(c). The concept of a non-delegable duty and the manner in which it operates as it relates to liability of the master, however, can only be properly understood by analyzing two separate sections of the *Restatement.*

First, as Section 219(1) makes clear, ordinarily, the master is liable only for torts that are committed by a servant while the servant is acting within the scope of his or her employment. That limitation, however, is subject to several exceptions, including the one found in Section 219(2)(c), which provides that if the servant's conduct violated a non-delegable duty of the master, then the

master will be liable even if the servant's conduct fell outside the scope of his or her employment. In essence, what Section 219(2)(c) means is that there are some duties which the master simply cannot delegate away. Therefore, in the employment context, the employer remains liable for acts of an employee that violate a non-delegable duty, regardless of whether the employee was acting within or outside of the scope of employment at the time.

Section 214 of the *Restatement* attempts to explain the concept of a non-delegable duty, defining it broadly in terms of "a master or other principal who is under a duty to provide protection for or to have care used to protect others or their property. . . ." That is to say, if the master is charged with the duty to provide protection for another, the duty is a non-delegable one, and the master remains liable for a breach of that duty of care even though a servant has been entrusted with the actual performance of that duty. In the words of the *Restatement,*

> A master or other principal who is under a duty to provide protection for or have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.
>
> [*Restatement, supra,* § 214.]

Although the *Restatement* itself notes that the concept of non-delegable duty is too complicated to define fully, *id.* at comment a (observing that "[i]t is beyond the scope of the Restatement of this Subject to do more than state the general rule and indicate the most frequently arising situations in which a master or other principal may be liable, although without personal fault, for conduct of his agents or servants, whether or not they are acting in scope of employment"), the commentary offers as illustrations a series of circumstances that would leave the master liable to another even though the act of the servant is both wrongful and outside of the scope of his or her employment.

For example, a railroad company would be liable to a passenger assaulted by a conductor who was responsible for "tak[ing] charge of [the] train." *Id.* at comment e, illustration 3. Likewise, a hotel

would be liable to a guest for theft from the guest by a chamber-maid even if the hotel believed that the employee was honest. *Id.* at comment e, illustration 5. Those illustrations are noteworthy because both identify situations in which the act of the employee is criminal in nature, and presumably outside of the scope of the employment, and yet the employer remains liable to the injured party. Strictly speaking, that result follows because the nature of the duty owed, for the care and well-being of the other, is such that it cannot be delegated. The *Restatement's* illustration involving the train conductor is significant for another reason. It illustrates the circumstance in which there is a non-delegable duty of care because the employer has placed the employee in a position in which it is foreseeable that the enforcement of the employer's rules will result in altercations with others. *Id.* at comment e, illustration 3. In that circumstance, the employer remains liable to the one who has been injured when the employee, even if acting in an otherwise unacceptable and overzealous fashion, has exerted force in carrying out the employer's rules.

The question, then, is whether the master, in this case Devereux, has been charged with the performance of a non-delegable duty. In addressing that question, the majority first rejects all of plaintiff's arguments to the effect that this Court has previously applied a non-delegable duty approach in matters arising in the context of in loco parentis relationships. *Ante* at 289–92, 37 *A.*3d at 481–83. With that as its backdrop, the Court then reasons that if in such similar contexts we have not concluded that a non-delegable duty exists, it would be unwarranted to find one in this matter.

In part, the majority reaches its conclusion by asserting that this Court rejected the argument that there was a non-delegable duty owed in the employment discrimination context, *see ante* at 291 & n. 4, 37 *A.*3d at 482 & n. 4 (citing *Lehmann v. Toys 'R' Us,* 132 *N.J.* 587, 619–20, 626 *A.*2d 445 (1993)). Although accurate, that observation is of little relevance to the larger question here. One can readily conclude that nothing in an ordinary employment

situation, even as it relates to employees who fall within the classes protected by our strong laws against discrimination, would meet the test of section 214 of the *Restatement*. The majority finds further support for its conclusion in its observation that this Court did not utilize the non-delegable duty approach in the somewhat similar settings of children who were victimized by sexual misconduct in school, *see Frugis v. Bracigliano,* 177 *N.J.* 250, 827 *A.*2d 1040 (2003), or in a private boarding school, *see Hardwicke v. Am. Boychoir Sch.,* 188 *N.J.* 69, 902 *A.*2d 900 (2006). By implication, the majority concludes that this Court should refuse to impose a non-delegable duty here because of the similarities of a vulnerable population, whose care had been entrusted to an entity that stood in loco parentis.

That assertion, however, reads far more into the opinions of the Court in *Frugis* and *Hardwicke* than is actually there. In the former, the Court had no need to consider whether the school's duty to the child was non-delegable, because the plaintiff's theory of recovery rested on negligent supervision. *Frugis, supra,* 177 *N.J.* at 257–58, 827 *A.*2d 1040. One cannot conclude from the absence of a discussion about non-delegable duties that this Court rejected any possible application of the theory in its entirety. The *Hardwicke* discussion is even less supportive of the majority's analysis. There, the Court relied on the *Restatement,* as does the majority today, quoting with obvious approval the passage concerning non-delegable duties. Although the Appellate Division in *Hardwicke* had utilized a non-delegable duty approach, *see Hardwicke v. Am. Boychoir Sch.,* 368 *N.J.Super.* 71, 104–05, 845 *A.*2d 619 (App.Div.2004), this Court based its conclusion about liability instead on the provisions of the Child Sexual Abuse Act. *Hardwicke, supra,* 188 *N.J.* at 99–102, 902 *A.*2d 900. In the process, however, this Court neither accepted nor rejected the Appellate Division's non-delegable duty analysis.

In both of those decisions, this Court found a basis for its analysis of liability other than one that would have rested on

concluding that there was a non-delegable duty, but that says nothing about whether it would apply to parties such as the ones now before the Court. That being so, the majority's implicit suggestion that this Court has rejected the argument being raised by plaintiff, and urged upon us by the amici, or that we instead have "underscore[d] the continued viability of reasonable care as the standard," *ante* at 291, 37 *A.*3d at 482, is incorrect.

Lost in the majority's reasoning is the fundamental basis for imposition of a non-delegable duty found in the *Restatement* definition itself, because nowhere in its analysis does the majority consider whether Devereux had "a duty to provide protection for or have care used to protect," *Restatement, supra,* § 214, Davis or the other residents who lived in and were cared for in its facility. Lost, as well, is the fundamental basis this Court identified and on which we concluded that a duty is non-delegable, namely, that its "value ... to the community is so significant that the law cannot allow it to be transferred to another." *Majestic Realty, supra,* 30 *N.J.* at 439, 153 *A.*2d 321. Instead of applying that well-established rule of law, the majority substitutes its expression of concern about the impact of a finding by this Court that Devereux owed Davis a duty of care that was non-delegable. *See ante* at 289, 37 *A.*3d at 481. Based on that concern alone, the majority concludes that a finding that Devereux's duty to Davis is non-delegable would be unwise.

There are, of course, strong parallels between the circumstances in which Davis found himself and the plaintiffs this Court has previously considered and as to which, concededly, our approach was a different one than the imposition of a non-delegable duty. But, by comparison, Davis is in an even more precarious position and more in need of protection by the entity to whom his care has been entrusted. Although he is an adult, and although he had shown aggressive tendencies in his residence, he is vulnerable in the extreme. His inability to communicate is profound, and even after he was suffering from severe burns inflicted upon him by

McClain, he obeyed her direction that he take a shower. More to the point, he was totally incapable of explaining to anyone what had happened to him, and was, therefore, incapable of protecting himself from any future injury. Not only was he vulnerable because he is always under the supervision of adults who exerted power over him, but Davis is even at the mercy of his caregivers because he lacks any semblance of the ability to point out his attacker. Had the attack left no visible wounds, Davis would have had no way to describe what he had endured or at whose hands. For me, Davis falls squarely within the language of this Court's precedents that have imposed a non-delegable duty and the contemplation of that concept as described in the *Restatement.*

This dispute does not mark the first time that a court has been called upon to consider whether an organization or government entity charged with the care of children or of disabled adults has a non-delegable duty of care. In a particularly persuasive opinion, the Supreme Court of Indiana held that a residential facility that undertook "the entire responsibility for [a resident's] comfort, safety and maintenance" had a non-delegable duty to protect a severely disabled fourteen-year-old from sexual assault by the nurse's aide charged with cleaning and dressing him. *Stropes v. Heritage House Childrens Ctr., Inc.,* 547 *N.E.*2d 244, 253–54 (Ind.1989). Moreover, consistent with the precedents that are expressed in the *Restatement,* having concluded that the duty was non-delegable, the court held that the facility was liable for any breach by its employees, regardless of whether the facility acted with care in hiring and training them and regardless of whether they acted within the scope of their employment. *Id.* at 251–54.

Although there is no clear consensus among our sister jurisdictions, to me the more recent trend and the more persuasive lines of authority militate in favor of concluding that the duty owed is indeed a non-delegable one. *See, e.g., Miller v. Martin,* 838 *So.*2d 761, 766–70 (La.2003) (holding that State Department of Social Services had non-delegable duty to prevent foster parents from abusing children in state custody that left State liable even for

intentional acts of abuse); *Hinckley v. Palm Beach Cnty. Bd. of Cnty. Comm'rs*, 801 *So.*2d 193, 195–96 (Fla.Dist.Ct.App.2001) (holding that county had special relationship, *see Restatement (Second) of Torts* § 315, with disabled adult that gave rise to non-delegable duty to prevent sexual abuse of passenger with developmental disabilities by driver of van used for special transport, even if van service was an independent contractor); *see also West v. Waymire*, 114 *F.*3d 646, 649 (7th Cir.1997) (suggesting that state law could impose non-delegable duty on police department to prevent officers from sexually molesting minors and adults, but holding that 42 *U.S.C.* § 1983 does not permit vicarious liability). *But see, e.g., Maguire v. Montana*, 254 *Mont.* 178, 835 *P.*2d 755 (1992) (declining to impose non-delegable duty on State to protect resident of developmental center from rape by employee charged with her daily care); *Worcester Ins. Co. v. Fells Acres Day Sch.*, 408 *Mass.* 393, 558 *N.E.*2d 958, 967–68 (1990) (declining to impose non-delegable duty on daycare center for staff's sexual abuse of children).

In the end, the majority's apparent misunderstanding of the concept of non-delegable duties and its misperception of the well-settled precedents from this Court have led it to an erroneous conclusion with which I cannot agree.

### B.

Further confounding the majority's opinion, and further illustrating what seems to me to be a fundamental misunderstanding of the very concept of non-delegable duties, the majority turns to the usual and ordinary analysis for determining whether a duty exists, *see ante* at 292–94, 37 *A.*3d at 483–84 (quoting *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993)), concluding that plaintiff cannot meet that test either. That analysis might be appropriate if we were considering whether Devereux owed Davis any duty at all, as this Court did, for example, in the context of considering whether a social host owed a theretofore non-existent duty of care to another when serving guests alcohol,

see *Kelly v. Gwinnell*, 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984) (considering essential concepts of foreseeability, risk and public policy), or when this Court in *Hopkins* addressed the existence of a duty owed by a realtor to those who visit open houses, *Hopkins, supra*, 132 *N.J.* at 439–45, 625 *A.*2d 1110. But it is an entirely inappropriate framework to use in this dispute, because, as even the majority concedes, *ante* at 291–93, 37 *A.*3d at 483, Devereux unquestionably owes a duty of care to Davis, and the only question that the Court should be addressing is whether or not that duty is non-delegable.

Nonetheless, in electing to utilize the ordinary four-part framework for deciding whether there is a duty owed, *see Hopkins, supra*, 132 *N.J.* at 439, 625 *A.*2d 1110, the majority finds no basis for imposing a non-delegable duty upon Devereux. Although reliance on the *Hopkins* test is misplaced, were the Court to apply it faithfully, it would not have reached the result that it did concerning the duty of care that Devereux owes Davis. Similarly misplaced is the majority's oblique suggestion, confined to a footnote, *ante* at 302 n. 10, 37 *A.*3d at 489 n. 10, that the Charitable Immunity Act, *N.J.S.A.* 2A:53A–7, would necessarily bar recovery. Any analysis of the implications of that statute would also be subject to this Court's holding in *Hardwicke, supra*, 188 *N.J.* at 97, 100–02, 902 *A.*2d 900.

In analyzing the relationship between Davis and Devereux, despite recognizing the strong statements by the Legislature, the Governor, and by this Court concerning the rights of persons with disabilities and the strict oversight that applies to entities like Devereux, *see ante* at 293–96, 37 *A.*3d at 484–85, the majority reasons that those protections somehow suffice. In and of itself, that is a remarkable departure from similar circumstances in which this Court has been compelled to conclude that a duty exists. Where in the past this Court has understood strong pronouncements of the Legislature and the Governor, even in the context of a closely regulated industry, to underscore the need for

equally strong pronouncements emanating from the common law, *see Kelly, supra,* 96 *N.J.* at 544–45, 476 *A.*2d 1219, today the Court apparently concludes that we can be comforted by those pronouncements, declining to find that the residential facility owes any other duty of care. Where in the past this Court has discerned from the acts of the Legislature and the Governor their expressions of public policy and applied it to our analysis of the common law, today the Court indulges in an exercise that weighs those concerns so as to advance a different public policy.

Turning to the second prong of the *Hopkins* test, the Court concludes that the nature of the risk is not sufficiently foreseeable to support the imposition of a duty. In part because the different amici do not agree completely on how the scope of the duty should be defined, the Court sees no basis to act. *See ante* at 296–98, 37 *A.*3d at 486. Yet, it cannot be more plain that the risk of injury to someone like Davis is foreseeable, because it is certainly not unexpected that a caregiver, like McClain, would decide to retaliate or defend herself against one who had so recently attacked her. That some of the amici urge this Court to find that a broad non-delegable duty exists, touching upon entities and individuals well in excess of those before the Court, is hardly a reason to find none at all.

Nor does the majority's evaluation of the third *Hopkins* factor square with the record. Resting on its assertion that Devereux was careful in hiring, screening, and training McClain, the majority comments, among other things, that "[t]here is no evidence that Devereux ignored hints that McClain had a potential for violence," *see ante* at 298, 37 *A.*3d at 486. But that belief is belied by the ample evidence that in the days immediately prior to her attack on Davis, McClain was twice attacked by him, that she demanded that Devereux do something to relieve her of the assignment or to assist her in carrying it out, and that she was again assigned to care for him without any assistance. Simply suggesting that Devereux screened and hired her with care in the first place

overlooks its abject failure to recognize the impending clash between her and Davis when her plea for relief was ignored. That being the case, the third factor, which focuses on the opportunity and ability to exercise care, also weighs in favor of the imposition of a duty.

Finally, in considering the fourth factor, the public interest, the majority again reasons that unless and until the problem of violent assaults on the most vulnerable members of our society becomes "pervasive," *see ante* at 298, 37 *A.*3d at 487, there is no basis on which this Court should act. Pointing to its legitimate concerns about a potential impact on the continued viability of the charities that most often provide care for persons with disabilities, *see ibid.*, the majority declines to even attempt to define the parameters of a duty that would protect those entrusted to the charities' care from abuse, *see ante* at 298–99, 37 *A.*3d at 487 (observing that "the 'public interest' consideration identified in *Hopkins* is also negatively implicated by the amorphous boundaries of the duty proposed").

I do not suggest that there are many circumstances in which it would be appropriate to conclude that a non-delegable duty exists, but if ever there were a circumstance of "a master ... who is under a duty to provide protection for or to have care used to protect [an]other[ ]," *Restatement, supra,* § 214, surely it is found in the relationship between Devereux and Davis. Indeed, the majority concludes that Devereux's duty begins and ends with its care in hiring, training and supervision of its employees, leaving no room for this Court to conclude that there is a heightened duty in the absence of a record that would "establish a pervasive pattern of abuse that would signal that existing law had failed to protect these vulnerable members of our society." *Ante* at 295–96, 37 *A.*3d at 485.

Along the way, the majority rejects as inadequate justification the increasingly strong expressions of concern voiced by this Court, *see Fees v. Trow,* 105 *N.J.* 330, 338, 521 *A.*2d 824 (1987), by

our Legislature, *see* New Jersey Developmentally Disabled Rights Act, *N.J.S.A.* 30:6D–1 to –12.6, and by our Governor. Their words and acts speak volumes about their concern for individuals like Davis. When signing "Tara's Law" to create a registry of offenders against individuals with developmental disabilities, Governor Christie declared that "[a]buse at the hands of a caregiver is a reprehensible action. The legislation that I am signing today is an important tool to help safeguard those with developmental disabilities from harmful caregivers taking advantage of their position." *See* Chris Megerian & Clair Heininger, *Gov. Chris Christie Signs Caregiver Abuse Registry Law*, NorthJersey.com, (April 30, 2010), http://www.northjersey.com/news/state/politics/043010_Gov_Chris_Christie_signs_caregiver_abuse_registry_law.html.

Unmoved by those pronouncements, and through its creation of a new "pervasive pattern of abuse" standard, the majority deems insufficient numerous reported instances of similar attacks, many here in New Jersey. *See, e.g.,* Michelle L. Meloy, *Sexual Victimization of Underserved and Understudied Populations*, Rutgers University–Camden, 2008, 22–30, available at http://www.state.nj.us/dca/divisions/dow/resources/pdfs/sexualvictimizationreport_070908.pdf (observing that "[a]buse is one of the hidden areas in the life" for individuals with developmental disabilities; reporting on statistics of sexual and physical abuse); Editorial, *Investigation Needed to Ensure Safety of Developmentally Disabled*, Star–Ledger, May 3, 2010, available at http://blog.nj.com/njv_editorial_page/2010/05/safety_of_developmentally_disa.html (calling for investigation into case of 28–year–old Tara O'Leary, who died after months of starvation and physical abuse at state-licensed sponsor home for the developmentally disabled); Susan K. Livio, *Coalition Against Institutional Child Abuse*, available at http://www.caica.org/STEPHEN_KOMMINOS_choking_death_at_Bancroft_group_home.htm (reporting on 2007 death of resident at Bancroft coupled with seven substantiated incidents of abuse and neglect inflicted upon him, including being hit in head by employee/caregiver); Michelle Sahn, *Judge Merges Group–Home Suits*, Home News Tribune, Nov. 13, 2002, at B1, available at http://www.keefebartels.

com/CM/PressRoom/gc-GroupHome.pdf (reporting on death of group home resident Danielle Gruskowski, who suffered severe burns on her face shortly before her death when caregiver allegedly threw hot tea at her); *Health Worker Admits Abusing Autistic Teen,* Courier–Post (Cherry Hill, NJ), Sept. 9, 2002, at B1 (reporting on guilty plea of residential facility employee who pinned down and choked autistic teenager in her care).

In contrast, when this Court concluded that a social host owed a duty of care arising from serving alcohol to a guest, it did so based on a comparatively thin record of statistics, confining its comment to a footnote. *Kelly, supra,* 96 *N.J.* at 545 n. 3, 476 *A.*2d 1219. One can only wonder how many more Roland Davises, Danielle Gruskowskis and Tara O'Learys will need to suffer before this Court finds the pattern sufficiently pervasive for it to extend to them the care afforded to landowners, *see Majestic Realty, supra,* 30 *N.J.* at 438, 153 *A.*2d 321, imbibers of alcohol, *see Kelly, supra,* 96 *N.J.* at 548, 476 *A.*2d 1219, or open house visitors, *see Hopkins, supra,* 132 *N.J.* at 446, 625 *A.*2d 1110.

## II.

The majority also rejects the alternate basis on which Davis urges us to find that liability of Devereux may rest, concluding that the appellate panel erred in its evaluation of ordinary principles of respondeat superior and in its conclusion that the record sufficed to withstand summary judgment with respect to McClain's purpose to serve her employer. Although there can be little debate about the law that governs this aspect of the claim, I dissent because the majority has overlooked the significant evidence in this record from which a jury could find that McClain's act was one that was taken within the scope of her employment.

The majority's approach begins with its analysis of the scope of employment, reasoning that McClain's act can in no way be seen to fit within its parameters. Even so, the majority must concede that the *Restatement,* which we have previously relied upon, *see Di Cosala v. Kay,* 91 *N.J.* 159, 169, 450 *A.*2d 508 (1982), comments

in two separate sections on the liability of the master for the use of force by a servant. *See Restatement, supra,* §§ 228, 245.

First, the *Restatement,* in its general statement about the scope of employment, recognizes that the use of force, even if intentional, may indeed fall within the scope of one's employment, at least if "the use of force is not unexpectable by the master." *Restatement, supra,* § 228(d). In a similar vein, as the *Restatement* points out, "a master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant." *Id.* at § 245.

In further explaining the proper application of the test where force has been used, the *Restatement* comments about the liability of the master when the servant uses excessive force or is mistaken in the use of force. *Id.* at § 245 comment e. In those circumstances, "the master is also subject to liability if the servant, while intending to act for his master, makes a negligent mistake of fact, or in an excess of zeal uses more than necessary force, or commits an error of law as to his privilege, or does an act combining all of these errors." *Ibid.*

Nor, in the view of the *Restatement,* is the master necessarily shielded from responsibility for a servant's use of force which is "actuated by personal motives." *Id.* at comment f. In that instance, the master remains liable "if the servant acts in part because of a personal motive, such as revenge." *Ibid.* Only "if the servant has no intent to act on his master's behalf" will the master be relieved of liability. *Ibid.* Although the *Restatement's* comment explains that the fact of "a servant act[ing] in an outrageous manner or inflict[ing] a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act," the implication is that such behavior is not proof of an act outside of the scope of employment, but only evidence thereof. *Ibid.*

This Court has held that the test for determining whether any particular act is within or outside of the scope of employment involves a fact-specific inquiry. *See Di Cosala, supra,* 91 *N.J.* at 168–69, 450 *A.*2d 508; *Gilborges v. Wallace,* 78 *N.J.* 342, 351–52, 396 *A.*2d 338 (1978). In describing the test, this Court has commented that it "refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Di Cosala, supra,* 91 *N.J.* at 169, 450 *A.*2d 508 (quoting W. Prosser, *Law of Torts,* 460–61 (4th ed.1971)).

It is in this context that Chief Justice Weintraub's oft-quoted comment setting forth the test to be applied is most instructive. *See Gibson v. Kennedy,* 23 *N.J.* 150, 158, 128 *A.*2d 480 (1957). As he pointed out,

> [a]ssaults and batteries rarely, if ever, redound to the economic advantage of the employer, and it may readily be assumed the employer would not wish them. The outrageous quality of an employee's act may well be persuasive in considering whether his motivation was purely personal, but if the employee is within the scope of employment and intends to further the employer's business, the employer is chargeable even though the employee's conduct be "imbecilic."
>
> [*Ibid.*]

And as Judge Learned Hand observed: "motives may be mixed; men may vent their spleen upon others and yet mean to further their master's business; that meaning, that intention is the test." *Nelson v. Am.-West African Line, Inc.,* 86 *F.*2d 730, 731–32 (2d Cir.1936), *cert. denied,* 300 *U.S.* 665, 57 *S.Ct.* 509, 81 *L.Ed.* 873 (1937). Likewise, as even the majority today observes, "[w]hen the employee's conduct—however aggressive and misguided—originated in his or her effort to fulfill an assigned task, the act has been held to be within the scope of employment." *Ante* at 303, 37 *A.*3d at 490 (summarizing holdings in *Gibson* and *Nelson* ).

In addressing more generally the use of force by an employee, the *Restatement* comments on the fact that there are some forms

of employment that are more likely to bring an employee into a situation in which force will be used. *Restatement* § 245 comment a. Although the specific situations that the *Restatement* identifies do not mirror the one now before this Court, the comment points out that "the liability of the principal depends fundamentally upon the likelihood of a battery or other tort in view of the kind of result to be accomplished, the customs of the enterprise and the nature of the persons normally employed for doing the work." *Ibid.* By and large, then, if McClain's duties were such that there was a likelihood of a physical altercation, her effort to protect herself might well have been motivated by her belief that it would enable her to carry out the duties assigned to her.

Focusing on McClain's act, and upon a limited description of the minutes that preceded it, the majority concludes that there is no basis in the record on which a reasonable jury could find that she was actuated even in part to serve the interests of Devereux. But it is only by reciting a few of the facts and only by relying on the opinion set forth in the police report that her act was premeditated that the majority can so conclude. That is, the majority points out that McClain arrived at work, sat for a few moments, then went to the microwave and heated water, that she did so because she thought Davis might kick her, that she then went upstairs and threw it on the sleeping Davis without a word and without provocation. Further, the majority points to McClain's statement to the police, that she was angry about her boyfriend's recent homicide, as the sole evidence concerning the motive for her horrific act. *Ante* at 307, 37 *A.*3d at 492.

To be sure, that summary lends support to the conclusion that McClain's action either was entirely motivated by her anger over her boyfriend's homicide or was committed in retaliation against Davis for his prior aggressions. But even the majority's recitation includes within it the observation that McClain armed herself with a cup of scalding water *because she was anticipating that Davis would attack her. Ante* at 281, 37 *A.*3d at 476. That reason for

having the heated water with her in the first place, however, is not inconsistent with having a purpose to serve the interests of Devereux. On its face, then, it would suffice to withstand summary judgment.

Moreover, the record reflects much evidence that has not found its way into the majority's opinion but that bears on the question of why McClain would approach Davis with a cup of boiling water in her hand. During the six months leading up to the incident, Davis, who had a long history of aggressive and assaultive behavior toward staff members, had been having many more such behaviors, to the point that there were concerns that he might be suffering from a medical condition that his limited communication skills left him unable to explain. He did not display these aggressions with all of the staff, but instead demonstrated positive attachments to at least one of his caregivers. That staff member, however, was not McClain. On the contrary, it is plain from this record that McClain had become the target for his aggressive outbursts.

On the two days that immediately preceded McClain's ill-fated decision, Davis had violently attacked her, each time with sufficient force that he had to be restrained, removed from her presence, and turned over for the balance of the day to another staff member or supervisor with whom he had no conflict. McClain's response to the first of those incidents is telling, because she "lost her cool," and demanded to know what her supervisor was going to do about Davis's attacks on her. In response, Devereux did not change McClain's assignment, nor did Devereux place Davis in the care of any of the other staff members, including any of the others with whom he had more positive interactions. That failure to act on Devereux's part led directly to the second attack on McClain, which took place the day before the incident in which Davis was so horribly burned. That time, Davis attacked McClain in the basement and had to be restrained and removed from her presence by two Devereux

caregivers, a supervisor and an employee, one of whom then spent the rest of the day caring for Davis without incident.

In spite of McClain's request, indeed her plea, that she be afforded some protection or help against a further attack, she was again assigned to Davis, and tasked with getting him out of bed. It is significant that the increase in Davis's aggressions, to the extent that they had been documented during the prior six months, were most often observed at bedtime and upon awaking in the morning. Confronted with those facts, a reasonable jury could conclude that McClain, not having been relieved of her duty to work with Davis even temporarily, and not in the company of anyone to assist her, could have believed that the only way to complete her assigned task of getting him out of bed was to be able to defend herself in the face of a renewed attack.

Nor is it accurate to conclude from the description of the attack as "premeditated," a word chosen by the police officer who summarized McClain's statement, that it was not a response to her concern about a renewed attack and therefore was unprovoked. The record reflects statements of one of the two other on-duty staff personnel that she heard McClain first speak to Davis and heard him begin to tantrum. Although the two statements attributed to her, one of which the majority has quoted, are not entirely consistent, it is clear that Davis was awake and was not going to get up when McClain entered the room. The other staff member reported hearing McClain first shouting at Davis either "I told you, you wasn't sleeping" or "you're not going to sleep now." She described the sounds he then began to make first as "screaming and stomping" and then as a kind of "scream [that] was different than" his usual screaming, presumably his response to being burned as McClain ordered him to get into the shower.

Although McClain herself has never been deposed, a reasonable jury could conclude that she first began to fulfill her assigned work duty of getting Davis out of bed and only threw the scalding water on him when she believed either that he was not going to comply by getting up or that she was again about to be attacked.

In either event, applying the *Gibson* rule would lead to the conclusion that she indeed was engaging in an act, within the scope of her duties, and that she was actuated, at least in part, to serve the purpose of Devereux. That her choice, in the words of the Court in *Gibson*, was an "imbecilic" one, does not mean that it was not made at least in part in an effort to carry out her assigned task. *Gibson, supra*, 23 *N.J.* at 158, 128 *A.*2d 480. Nor, for that matter, did this Court, either in *Gibson* or today, suggest that the choice must be noble or even rational. The majority today has concluded that applying the scope of employment test, as to which we all agree, to the facts leaves no room for a jury to find that McClain had any purpose to serve Devereux. But applying the test to all of the facts, and giving the opponent of the motion the benefit of all of the favorable inferences, makes it plain that the majority's conclusion is mistaken.

That McClain's act of tossing scalding water on Davis was a brutal act is beyond question; that it was entirely devoid of any intent on her part to perform the task assigned to her of getting him out of bed and about his daily activities, such that Devereux bears no responsibility to him is not, in my view, so beyond debate that no reasonable jury could find otherwise. This Court has repeatedly cautioned our trial courts about the difficulty of evaluating intent and has repeatedly commented that it is often inappropriate for summary judgment. *See Simonson v. Z Cranbury Assocs. P'ship*, 149 *N.J.* 536, 540, 695 *A.*2d 222 (1997) (observing that "summary judgment is usually inappropriate when factually sensitive issues such as intent are present"); *cf. Bedrock Founds., Inc. v. Geo. H. Brewster & Son, Inc.*, 31 *N.J.* 124, 132–33, 155 *A.*2d 536 (1959) (commenting that evidence of trade custom and usage should be considered by jury to decide parties' intent).

The debate between the majority and me about the meaning and implications of the police summary of McClain's statement and the two statements given by the other staff member well illustrates the inherent danger of disposing of the respondeat superior claim by way of summary judgment. In similar circum-

stances, other courts have recognized that although egregious criminal acts "lend themselves to arguably the most instinctive conclusion that [they] could never be within the scope of one's employment ... the resolution of the question does not turn on the type of act committed or on the perpetrator's emotional baggage." *Stropes, supra,* 547 *N.E.*2d at 248–49 (concluding that sexual assault by staff member on severely disabled individual in residential facility should not have been dismissed without trial); *see Marston v. Minneapolis Clinic of Psych. and Neuro.,* 329 *N.W.*2d 306, 311 (Minn.1982) (concluding that employee's personal motivation should not be considered in respondeat superior analysis). The majority should be similarly circumspect in its pronouncement that this record falls short.

## III.

In the end, I dissent because it is clear that the majority has misperceived the meaning of non-delegable duties, and has misapplied, therefore, the law that governs this Court in finding that such a duty exists. In doing so, this Court finds ample room to protect property but not to protect people, leaving largely defenseless those among us who are the most vulnerable members of our population. Moreover, I dissent because the majority is unmoved by the reality that there will be people like McClain, trying to perform work with a challenged person like Davis, who will act in ways that, while we need not condone them, nonetheless were actuated in part by service to their employer. Creating an impenetrable shield around the facility charged with the care of the profoundly disabled Roland Davis in these circumstances hardly advances the cause of a just society. I therefore respectfully dissent.

*For affirmance in part; reversal in part*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN and PATTERSON and Judge WEFING (temporarily assigned)—5.

*For dissent*—Justices LONG and HOENS—2.