**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1310-24

H.Z.,[1]

     Petitioner-Appellant,

v.

DEPARTMENT OF HUMAN
SERVICES,

     Respondent-Respondent.

_____

     Submitted March 9, 2026 – Decided March 20, 2026

     Before Judges Sabatino and Natali.

     On appeal from the New Jersey Department of Human Services, Office of Program Integrity and Accountability, Docket No. DRA-23-004.

     Richard Q. Hark, attorney for appellant.

     Jennifer Davenport, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Barkha Patel, Deputy Attorney General, on the brief).

---

[1] To protect the privacy of the individuals, we refer to them by their initials. R. 1:38-3(f)(8).

PER CURIAM

This appeal of a final agency decision arises out of the overnight escape (referred to by the parties as "an elopement") of an adult resident from Devereux Advanced Behavioral Health ("Devereux"), a private regulated facility for developmentally disabled persons. Police found the resident a few hours after his elopement, having traveled by foot over three miles away from Devereux, barefoot, partially clothed, frostbitten, and injured. Appellant H.Z., who was employed at the facility as a worker licensed by the New Jersey Department of Human Services ("the DHS"), was fired by his employer, as well as the two other workers who were on duty with him that evening.

The DHS brought administrative proceedings against H.Z. to place him on a Central Registry that bars his employment in certain caregiver positions. After a hearing in the Office of Administrative Law ("OAL") at which H.Z. was represented by counsel, an Administrative Law Judge ("ALJ") found that DHS had met its burden, by a preponderance of the evidence, of showing that H.Z. had committed a substantiated act of neglect against the resident. The DHS adopted the ALJ's decision and this counseled appeal ensued.

Applying the deference we owe to the agency's regulatory role and to the ALJ's fact-finding, we affirm.

A-1310-24

Before we describe the pertinent facts and circumstances, we provide the following overview of the statutory and regulatory context.

The Legislature has declared: "[i]t is in the public interest for the State to provide for the protection of individuals with developmental disabilities <u>by identifying those caregivers who have wrongfully caused them injury</u>." N.J.S.A. 30:6D-73(a) (emphasis added). A "caregiver," as defined in N.J.S.A. 30:6D-74, is "a person [receiving] State funding, directly or indirectly, in whole or in part, to provide services [to] or supports . . . an individual with a developmental disability."[2]

To better protect developmentally disabled persons, a "Central Registry of Offenders Against Individuals with Developmental Disabilities in the [DHS]" became effective on October 27, 2010, with its stated purpose being "to prevent caregivers who become offenders against individuals with developmental disabilities from working with [developmentally disabled persons]." N.J.S.A. 30:6D-73(d). The expressed policy rationale of establishing the Central Registry was to "assure that the lives of innocent individuals with developmental

---

[2] Appellant does not dispute that, at the relevant time, he was employed by Devereux as such a "caregiver."

disabilities <u>are immediately safeguarded from further injury and possible death</u> and that the legal rights of such individuals are fully protected." N.J.S.A. 30:6D-73(c) (emphasis added). "[E]mployers are prohibited from hiring individuals whose names appear on [the Central] Registry to care for people with developmental disabilities." <u>Davis v. Devereux Found.</u>, 209 N.J. 269, 295 (2012) (citing N.J.S.A. 30:6D-77).

Pursuant to the statutory scheme, the DHS Commissioner is required to "adopt rules and regulations that define the procedures and standards for inclusion of an offending caregiver on the [C]entral [R]egistry . . . ." N.J.S.A. 30:6D-77(b). One of those regulations requires the DHS Office of Investigations to "investigate incidents occurring in . . . facilities licensed, contracted, or funded by the [DHS], or State-operated developmental centers that serve individuals with developmental disabilities." N.J.A.C. 10:44D-3.1(a).

In particular, "[t]he [DHS] investigating unit shall evaluate the available information and . . . determine whether abuse, neglect or exploitation has occurred, attempt to identify the perpetrator or perpetrators thereof <u>and then make a finding either substantiating or not substantiating each allegation</u>." N.J.A.C. 10:44D-3.2(a) (emphasis added). "The findings of substantiation shall

be based upon the <u>preponderance of the evidence</u> found during the investigation." N.J.A.C. 10:44D-3.2(b) (emphasis added).

"Neglect" is defined by statute at N.J.S.A. 30:6D-74 as any of the following conduct "by a caregiver on an individual with a developmental disability: willfully failing to provide proper and sufficient food, clothing, maintenance, medical care, or a clean and proper home; <u>or failing to do or permit to be done any act necessary for the well-being of an individual with a developmental disability</u>." (Emphasis added); <u>see also</u> N.J.A.C. 10:44D-1.2 (comparably defining "neglect" almost identically to N.J.S.A. 30:6D-74).[3]

"For inclusion on the [C]entral [R]egistry in the case of a substantiated incident of neglect, the caregiver shall have acted with <u>gross negligence, recklessness, or in a pattern of behavior</u> that causes or potentially causes harm to an individual with a developmental disability." N.J.S.A. 30:6D-77(b)(2) (emphasis added). Under an associated regulation, N.J.A.C. 10:44D-4.1(c)(1), the concept of "acting with gross negligence" is defined as "a conscious,

---

[3]   The definitions of neglect are essentially the same, with one very minor linguistic difference that does not affect our analysis. N.J.S.A. 30:6D-74 refers to "<u>failing</u> to do or permit to be done any act necessary for the well-being [of a developmentally disabled individual]," whereas N.J.A.C. 10:44D-1.2 refers to a "<u>failure</u> to do, or permit to be done, any act necessary for the well-being [of a developmentally disabled individual]." (Emphasis added).

A-1310-24

voluntary act <u>or omission in reckless disregard of a duty and of the consequences</u> to another party."  (Emphasis added).

If the DHS investigating unit "has determined that any or all of the elements in [N.J.A.C. 10:44D-4.1 subsections] (b), (c) or (d) . . . are present, the investigating unit shall refer the matter to the Commissioner . . . who <u>shall determine whether the perpetrator will be considered</u> for inclusion on the Central Registry . . . [.]"  N.J.A.C. 10:44D-4.1(g) (emphasis added).  However, even if an individual's name is placed onto the Central Registry, "[a] person may apply for removal of his name to the [C]ommissioner after a period of five years" by "affirmatively demonstrat[ing] . . . clear and convincing evidence of rehabilitation . . . [.]"  N.J.S.A. 30:6D-77(c)(4).

## II.

The record reflects the following relevant facts and procedural history.

### Appellant's Job Duties

In October 2021, appellant H.Z. was hired by Devereux to serve as what is termed a "direct support professional" ("DSP") at one of its facilities in New

Jersey. As described by the ALJ, Devereux "is a residential care center for people with disabilities who need assistance with daily living."[4]

Appellant's role at Devereux required that he assist individuals with developmental disabilities carry out their everyday activities. He primarily worked in a "group home" setting referred to internally by Devereux staff as "longhouse two."[5] Tammy McLean, a Behavior Specialist and former Program Manager at Devereux, testified at the OAL hearing about the organization's protocols and procedures. McLean explained that at the time appellant was employed by Devereux, there "should have been . . . at least three people on the shift" for all overnight shifts taking place in longhouse two.

Resident P.C., His Needs, and Past History of Elopement

In February 2022 when the underlying events of this case took place, longhouse two housed four developmentally disabled residents. One of these residents was P.C., who was assigned a "Positive Behavior Support Plan"

---

[4] See also Davis, 209 N.J. at 278 ("Devereux is a non-profit organization whose mission is to provide 'services around the nation for persons with emotional, developmental and educational disabilities'").

[5] The record refers to several of these group homes operated by Devereux next to or otherwise nearby longhouse two, and that each of these group homes was referred to internally by Devereux staff as "longhouse number (one, two, etc.)."

Restriction Level of III by Devereux based upon the following exhibited behaviors: (1) pica ("[p]lacing non-edible items or items not intended for mouthing . . . to/in mouth, with or without ingesting the item"); (2) self-injurious behavior; (3) physical aggression; (4) elopement ("[a]ny occurrence of leaving a building without a staff member"); and (5) incontinence. P.C. received services from the DHS's Division of Developmental Disabilities. He was additionally described by staff witnesses as being largely non-verbal.

It is undisputed that P.C. had an extensive history of elopement. Given that history and the harm he was capable of inflicting upon himself, P.C. needed to be checked on by DSP staff members "every [fifteen] minute[s]" and remain within one's "visual field" or "line of sight" at all times, including while he was sleeping or using the bathroom.

P.C.'s Elopement from Longhouse Two During Appellant's Shift

Beginning at approximately 11:00 p.m. on February 13, 2022, appellant began working an overnight shift in longhouse two alongside two other DSP staff members, "C.O." and "K.A."

At some unknown point in time before 3:00 a.m. on the morning of February 14, P.C. successfully eloped from longhouse two. Although the events of what exactly transpired on this night are heavily disputed, the record

conclusively shows that P.C.'s elopement went unnoticed by DSP staff until they were notified of his recovery by police later that morning.

At 2:51 a.m. on February 14, four West Milford police officers responded to a third-party call regarding "a male party running South in the middle of Lake Shore Road towards [a deli] on Warwick Turnpike." P.C. was later found by police inside of the deli, a location approximately "3.2 miles away from [longhouse two]." He was discovered wearing a green sweatshirt, boxer briefs, and no shoes.

In addition to P.C. appearing generally "agitated and confused," officers observed that his boxer briefs "looked as if he had urinated [on] himself as well as defecated [on] himself from his boxers to the backs of his thighs." P.C.'s feet, fingers, left elbow, and knees appeared to have blood on them as well. The recorded temperature that night was well below freezing, noted by the ALJ to have been 9° Fahrenheit.

Soon thereafter, West Milford Patrol Officer Suzanne Novakowski was sent to longhouse two "to attempt to make contact with [Devereux] staff to confirm that [P.C. was] in fact a resident of th[at] facility." Appellant was the first DSP staff member to respond to Officer Novakowski's arrival at the group home. According to the officer, appellant, upon learning of P.C.'s elopement,

9

"immediately went to do a bed check of [longhouse two's] residents."  After appellant discovered that P.C. was not in bed or elsewhere in the group home, P.C.'s belongings were gathered by DSP staff.

Officer Novakowski transported appellant to the deli to meet with P.C. From there, appellant accompanied P.C. by ambulance to a local hospital, where P.C. was evaluated for cold exposure.

At the hospital, P.C. was diagnosed with "a closed head injury and a periorbital ecchymosis[6] of the left eye."  Though initially discharged from that hospital on February 14, P.C. was later taken to another hospital on February 15 to have his feet evaluated by medical professionals due to discoloration and blisters.  He was later diagnosed with frostbite on his left and right feet, which were wrapped with bandages.

Appellant's Suspension and Central Registry Designation

In the aftermath of these events, DHS Investigator Lauren Koval prepared an investigation report, which was later admitted into evidence at the OAL

---

[6] While not defined in the record, "periorbital ecchymosis" refers to bruising around the eyes "where blood pools underneath [the] skin.  The bruises are darker than [one's] natural skin tone and are often blue to purple."  The condition is "usually a sign of an injury, like a skull fracture."  Raccoon Eyes, Cleveland Clinic (Jan. 24, 2024), https://my.clevelandclinic.org/health/symptoms /raccoon-eyes.

A-1310-24

hearing. Appellant, C.O., and K.A. were all interviewed as part of Koval's investigation.

Koval concluded that, "[b]ased on a preponderance of the testimonial and documentary evidence obtained, the allegation that [P.C.] . . . was neglected by former Devereux New Jersey [DSPs, C.O., H.Z., and K.A.], [wa]s substantiated." (Emphasis added). Consequently, Koval recommended that appellant, along with C.O. and K.A., have their names placed on the Central Registry.

Appellant worked one additional shift as a DSP for Devereux the night of February 15. He was informed the next day, February 16, that he had been "suspended until further notice."

In addition to being interviewed by Koval, appellant submitted a written statement to the DHS in March 2022 describing what had transpired on the night of P.C.'s elopement from longhouse two. Soon thereafter, Devereux notified appellant by letter that he had been terminated from his job as a DSP.

Appellant was subsequently informed in a separate letter from DHS that his name had been placed on the Central Registry. He administratively contested that placement. DHS accordingly transmitted the contested matter to the OAL.

The OAL Hearings

The ALJ presided over hearings on two nonconsecutive days in October 2023 and January 2024. At these hearings, DHS elicited testimony from Investigator Koval, Officer Novakowski, and former Devereux Program Manager McLean. Appellant testified on his own behalf, and also presented testimony from a former Devereux DSP staff member, J.O.

Appellant's Accounts of the Events

In defending his conduct, appellant has stressed that he and his two co-workers were outnumbered by the four residents they were assigned to cover that night. He has claimed he was unable to monitor P.C. because he was diverted by having to attend to the needs of another resident who was engaging in violent behavior, and that it was his co-worker K.A. who should have been watching over P.C. the night of February 14. Given those circumstances, appellant contends that his response to the situation was neither grossly neglectful nor reckless.

More specifically, appellant testified that, towards the start of his shift that began the night of February 13, a resident identified as "A.C." began to hurt himself by repeatedly hitting his head against a wall while screaming. Appellant explained that, as he had been trained to do, he then "quickly rushed to calm

12

[A.C.] down and put his helmet on him," proceeding to take this helmet off and placing it back on A.C. every fifteen minutes while the behavioral incident was ongoing. According to appellant, the incident with A.C. lasted from approximately 11:00 p.m. until 3:00 a.m., concluding right before Officer Novakowski arrived at longhouse two the morning of February 14.

Appellant further testified that, around the same time that he was assisting A.C., K.A. had taken P.C. to his bedroom to go to sleep. As professed by appellant, K.A. had been "in charge" of P.C. that night, because:

> [K.C.] took him in and he's supposed to be with him because I have somebody [A.C.] that has totally occupied me which [K.C.] is aware of.
>
>      . . . .
>
>  . . . So that's why when I'm occupied with that person I couldn't be by myself to be with the other person. So the next staff is supposed to immediately take charge of the other person because . . . it's one on one. These . . . residents [like P.C. and A.C.] are one on one.
>
> [(Emphasis added).][7]

---

[7]  To the extent that his testimony in this regard implied that Devereux had imposed specific "one-to-one" resident assignments to DSP staff members, appellant appears to have abandoned that position in this appeal.

A-1310-24

Appellant recalled that his other co-worker, C.O., had initially tried to help him with A.C. around 12:00 a.m., but after talking to A.C. for "some time[,] [C.O.] said okay, that she's going downstairs to continue" the laundry she had been doing for the group home's residents earlier that night.[8] Appellant further claimed that K.A. came into A.C.'s bedroom around 1:30 a.m. to assist him, prompting appellant to immediately ask K.A. "where is P.C. the person you're in charge of?  Where is P.C.?  And [K.A.] said that P.C. was sleeping."

Appellant acknowledged on cross-examination that he had not told K.A. "to go back and watch [P.C.]," despite having knowledge that no other staff member was doing so throughout the time that he was attending to A.C.  At some disputed point in time, K.A. left A.C.'s room to use the bathroom.

Competing Testimony by DHS Witnesses About the Night's Events

Appellant's account of what had transpired was substantially refuted by the testimony of Officer Novakowski and Investigator Koval.

---

[8]  When asked on cross-examination why "[i]f [A.C.] was having a behavioral episode for the next three hours until [3:00 a.m.,] why didn't you call [C.O.] back up to help you?" appellant responded "I couldn't call [C.O.] to help me because she was downstairs and there is a generator by the side of [A.C.'s] room . . . I don't have to call all of them [to] come assist me while they have to do other jobs.  I felt I could stand and take care of [A.C.]."

Officer Novakowski testified that, upon arriving at longhouse two the morning of February 14, the entire group home was completely "dark," with no lights visible from the exterior of the home appearing to have been turned on anywhere inside. After ringing the doorbell and knocking for "[a]t least ten to fifteen minutes," Officer Novakowski further testified that it was appellant who had first answered the door, appearing notably disoriented, as if he had just woken up from sleep. The officer additionally recalled that, upon getting a good look inside the home, she noted that there were "chairs that were basically positioned in a way to block anybody from going down the stairs," as well as "a bunched up blanket on one of the couches and a mattress on the floor."

Based in part upon Officer Novakowski's observations, documented in a police report and provided to the DHS as part of its investigation into the incident of P.C.'s elopement, Investigator Koval testified that she regarded appellant's narrative to be "[v]ery unlikely because if a client was having that loud of a behavioral incident every other client in the house would've been awake, [and] all the lights would've been on in the house." Koval added that,"[i]f the client was having a behavioral incident like that[,] 911 should be called for his safety, as well as [appellant's] safety." She additionally emphasized that "[i]f the client is banging his head against the wall you should

call 911 immediately so they do not harm themselves or others, and [appellant] did not do any of those things."[9]

Koval further contradicted appellant's testimony about the allocation of responsibility for residents among DSP staff members working in longhouse two, testifying that the three co-workers that night–appellant, K.A., and C.O.– each had "[a] responsibility to all of the clients. Not one staff in that home was assigned one client. At no point during my investigation did [appellant] say that he was assigned to [A.C.], at any point. . . . [N]o one in the investigation, whether they worked for Devereux or other staff in the home said that [appellant] was assigned to [A.C.] and could not leave him."

McLean likewise testified that "all the staff [in longhouse two] should have been accountable for [P.C.]," as no specific DSP was typically assigned to any one individual resident at the time that she had been Program Manager at Devereux.

---

[9]  McLean similarly testified that "[s]o with . . . a violent behavior we always tell the staff if . . . they're doing like head banging[,] being like really aggressive <u>you're always supposed to call 9-1-1</u>. Like that's our main thing. You always call 9-1-1 if you can't control it. You always call 9-1-1."

A-1310-24

<u>The ALJ's Decision</u>

The ALJ issued an eleven-page initial decision on November 14, 2024, denying H.Z.'s appeal of his placement on the Central Registry. Addressing first the issue of whether appellant H.Z. had neglected P.C., the ALJ found that:

> . . . DHS has established that all staff were responsible for the safety of all of the residents on February 14, 2022. H.Z. knew that P.C. required direct supervision at all times, that P.C. had multiple medical conditions, including pica, and leaving him alone could lead to substantial harm. H.Z. knew that K.A. left P.C. alone for over an hour while K.A. assisted H.Z. with A.C. H.Z. asked K.A. about P.C.[,] but did nothing to provide sufficient care to P.C. when H.Z. learned that P.C. was not being supervised.

Given these findings, the ALJ concluded that appellant "failed to do an act necessary for the well-being of an individual with a developmental disability," and likewise concluded that the "DHS ha[d] met its burden by a preponderance of the evidence that H.Z.'s finding of substantiated neglect was proper."

The ALJ recognized the challenging situation appellant had faced on the night in question, but nevertheless concluded that appellant had been remiss in his duties:

> The <u>testimony offered by H.Z.</u> that he provided line of sight supervision to A.C. during the relevant time period and therefore could not have provided that same level of supervision to P.C. <u>seems, on its face, to have some merit.</u> It would <u>clearly be impossible</u> for

17

H.Z. to be in P.C.'s bedroom and A.C.'s bedroom at the same time. However, setting aside the specific duty that H.Z. had to provide line of sight supervision to A.C., H.Z. also had a general duty to care for the well-being of all the residents of Longhouse #2. This general duty of care was described by Ms. Koval when she testified that no staff member was ever assigned to any client at any specific time and that P.C.'s supervision was the responsibility of all staff at the nursing home.

[(Emphasis added).]

The ALJ further elaborated on this point, as follows:

In the incident report, H.Z. stated that at approximately 1:30 am while A.C. was engaged in his behavioral episode, K.A. left P.C. unattended in his room and came to assist H.Z. with A.C. from approximately 1:30 am until 3:00 am. Assuming his statement was true, H.Z. knew that P.C. was left alone for at least 1.5 hours without any supervision, yet he did nothing to make certain either K.A. or the other DSP (C.O.) who had been doing laundry, was checking on P.C. His failure to do so was clearly intentional because he asked K.A. about P.C., and K.A. responded that he was asleep. H.Z. stated in the incident report and in his testimony that he did not tell K.A. to go back to P.C.'s room or to get help from another staff member.

[(Emphasis added).]

In light of these findings, the ALJ concluded that: (1) appellant's "general duty to care for the well-being of all residents required him at the very least to instruct K.A. or C.O. to stay with P.C."; (2) his "failure to do so was a knowing

and voluntary act in reckless disregard of his duty and result[ed in] consequences to P.C."; (3) appellant "knew of P.C.'s serious conditions and high needs and left him alone despite knowing this"; and (4) his placement on the Central Registry was therefore "appropriate."  (Emphasis added).

The DHS Final Agency Decision

Director Deborah Robinson of the DHS issued a final agency decision on December 10, 2024, adopting the ALJ's findings.  Her decision noted:

> . . . I concur with the Administrative Law Judge's findings and conclusions.  The ALJ had the opportunity to assess the credibility and veracity of the witnesses; I defer to the ALJ's opinions concerning these matters, based upon the reasoned observations, as extensively described in the Initial Decision.  I CONCLUDE AND AFFIRM that H.Z. failed to maintain line-of-sight supervision of P.C., knowing full well that if left unsupervised, P.C. would engage in harmful behaviors.  H.Z. was correctly found to have been substantiated of neglect, as defined in N.J.A.C. 10:44D-1.2.  H.Z.'s inadequate provision care for the well-being of the group home residents was neglect, pursuant to the Central Registry regulations.  I CONCLUDE AND AFFIRM that H.Z. acted intentionally in failing to maintain line-of-sight supervision, knowing full well that if left unsupervised, P.C. would engage in harmful behaviors.  H.Z.'s failure to supervise all of the home's residents was a knowing and voluntary act in reckless disregard of his duty and resulted in consequences to P.C.  I CONCLUDE AND AFFIRM that H.Z.'s actions were intentional, reckless, and constituted neglect and mistreatment of P.C.

I CONCLUDE AND AFFIRM that <u>DHS has sustained its burden of proving, by a preponderance of the credible evidence, that the actions of H.Z. rose to the level of neglect as defined in N.J.A.C. 10:44D-1.2</u>. I CONCLUDE AND AFFIRM that H.Z. acted with careless disregard for the well-being of P.C. and the other residents of the group home; thereby, justifying that H.Z.'s name be entered onto the Central Registry.

Pursuant to N.J.A.C. 1:1-18.6(d), it is the Final Decision of the Department of Human Services that I ORDER <u>the placement of H.Z.'s name on the Central Registry</u> of Offenders against Individuals with Developmental Disabilities.

[(Emphasis added).]

This appeal ensued.

### III.

On appeal, H.Z. argues we should reverse the final agency decision because, as he had contended below, (a) the DHS failed to meet its evidentiary burden; and (b) the undisputed facts do not meet the statutory definition of abuse or neglect. Appellant also presents two arguments not raised below, namely that: (c) the decision rests primarily on hearsay and thus lacks the required residuum of competent proof; and (d) revocation and summary suspension are grossly disproportionate to his alleged lapse.

As case law of our state has long made clear, our scope of review of an administrative agency's final decision is limited. <u>Parsells v. Bd. of Educ. of</u>

Borough of Somerville, 254 N.J. 152, 162 (2023); In re Herrmann, 192 N.J. 19, 27 (2007). The "final determination of an administrative agency . . . is entitled to substantial deference." In re Eastwick Coll. LPN-to RN Bridge Program, 225 N.J. 533, 541 (2016); see also In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (finding a "'strong presumption of reasonableness attaches to the actions of the administrative agencies'" (internal citation omitted)).

Appellate courts generally review agency decisions "under an arbitrary and capricious standard." Parsells, 254 N.J. at 162 (citing Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019)). To that end:

> [A]n appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence.
>
> [In re Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008).]

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

Further, insofar as the DHS statutes and regulations of caregivers are to be applied here, "[i]t is settled that '[a]n administrative agency's interpretation

of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (alteration in original) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)). Courts ""must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'"" Parsells, 254 N.J. at 162 (internal citations omitted). That being said, "[w]hile we must defer to the agency's expertise, we need not surrender to it." N.J. Chapter of Nat'l. Ass'n of Indus. and Off. Parks v. N.J. Dep't of Env't Prot., 241 N.J. Super. 145, 165 (App. Div. 1990). In addition, we review strictly legal questions de novo. Bowser v. Bd. of Trs., Police, and Firemen's Ret. Sys., 455 N.J. Super. 165, 170-72 (App. Div. 2018).

Having applied these standards, we affirm the final agency decision determining that appellant engaged in conduct constituting "neglect" of P.C., which enabled P.C.'s elopement and severe exposure to harm on a sub-freezing night. N.J.S.A. 30:6D-74; N.J.A.C. 10:44D-1.2. We uphold the agency decision, and appellant's placement on the Central Registry, substantially for the reasons expressed in the ALJ's initial decision and the Director's adoption of the ALJ's ruling. We add only a few comments.

22

There was substantial credible evidence in the record—conveyed through both testimony and the admitted documents—that supports the finding of neglect. The proofs substantiated that, by ignoring P.C.'s needs and not arranging for others to monitor P.C.'s behavior, appellant failed "to do, or permit to be done, any act necessary for the well-being of an individual with a developmental disability." N.J.A.C. 10:44D-1.2.

We recognize that appellant contends that he was diverted to attend instead to another resident, A.C., who was engaging in violent, head-banging behavior. Even so, as the agency's witnesses explained, appellant should have called 9-1-1 to intervene with A.C., or otherwise have made sure that one of his co-workers was watching P.C. during the period that he was otherwise occupied with A.C. The ALJ reasonably found the agency's witnesses concerning the events more persuasive than appellant. We must defer to the ALJ's assessment of those witnesses. Burlington Cnty. Bd. of Soc. Servs. v. G.W., 425 N.J. Super. 42, 47 (App. Div. 2012).

We reject appellant's first-time argument that the decisions below unduly rested on hearsay. The investigatory reports were admitted into evidence without objection. Moreover, the live testimony of the DHS witnesses amply

provided a "residuum" of corroboration, in compliance with N.J.A.C. 1:1-15.5(c).

We decline to set aside the agency's placement of appellant's name on the Central Registry. His substantiated neglect met the criteria for Registry placement under N.J.S.A. 30:6D-77(b)(2). The submissions further suggest that appellant's two co-workers were also placed on the Registry, meaning he alone was not singled out for sanctions by the DHS. We are obligated to defer to the DHS's expertise and regulatory role in imposing such sanctions. In re Herrmann, 192 N.J. at 27. That said, we appreciate that appellant and his co-workers were confronted with a challenging situation on the night of P.C.'s elopement, and acknowledge the fact that the residents of longhouse two outnumbered the DSP staff members four to three that night. We also are cognizant of the inherent difficulty that likely stems from any individual DSP being made to monitor more than one resident at a time, depending on the needs and level of care required for each resident in question. Even so, any regulatory issues pertaining to under-staffing or managerial deficiencies are best addressed by the DHS in its role as the state agency that licenses group homes such as Devereux. See N.J.S.A. 30:11B-4; N.J.A.C. 10:44A-1.3 to -1.8.

To the extent we have not addressed them, all other issues raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(D)-(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-1310-24